UNITED STATES of America

v.

Al KINKLE.

Crim. No. 84–00482–04.

United States District Court, E.D. Pennsylvania.

March 27, 1986.

---

Edward S.G. Dennis, Jr., U.S. Atty., and James M. Becker, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Gregory T. Magarity and Mark F. Bideau, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Al Kinkle was convicted of conspiracy to possess a controlled substance with intent to distribute and unlawful use of a telephone. Presently before the court is defendant's motion for a judgment of acquittal or a new trial. For reasons that follow, this motion will be denied.

Defendant first contends that the admission of the testimony of government informant Vincent Ponzio violated his right to due process of law under the fifth amendment. According to Kinkle, the government agreed to have state charges against Ponzio dropped, provide favorable testimony during Ponzio's sentencing in New Jersey on other charges, limit Ponzio's potential period of incarceration for the charges resulting from this investigation, and finally, Kinkle alleges that the government agreed to pay money to Ponzio.

Kinkle asserts that the trial testimony shows that the FBI and DEA paid Ponzio thousands of dollars during the period of his cooperation. Most important, defendant contends that Ponzio understood that he would receive additional money at the conclusion of the case if Ponzio's cooperation resulted in Kinkle's conviction, and that this alleged contingency agreement deprived Kinkle of due process.

The government responds by stating that no such contingency agreement was formed. It acknowledges that it did enter into a plea agreement with Ponzio, and an FBI agent did mention the possibility that Ponzio might receive an unspecified sum of money upon completion of his cooperation. The government asserts, however, that such an agreement does not preclude Ponzio's testifying against Kinkle.

The conduct of law enforcement officials may be so outrageous that due process principles would bar the government from securing a conviction. *See United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *United States v. Jannotti,* 673 F.2d 578, 606 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Twigg,* 588 F.2d 373, 379 (3d Cir.1978). Fundamental fairness will not permit a person to be convicted of a crime in which governmental conduct was "outrageous." *Twigg,* 588 F.2d at 379. However, a court must exercise

"scrupulous restraint before [denouncing] law enforcement conduct as constitutionally impermissible." *Jannotti*, 673 F.2d at 607. This restraint is particularly appropriate in the narcotics-prosecution context, where the Supreme Court has noted:

> One cannot easily exaggerate the problems encountered by law enforcement authorities in dealing effectively with an expanding narcotics traffic ... which is one of the major contributing causes of escalating crime in our cities .... Enforcement officials therefore must be allowed flexibility adequate to counter effectively such criminal activity.

*Hampton v. United States*, 425 U.S. 484, 495–97 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976).

Courts have identified two chief due process concerns that flow from the use of contingency agreements: the fear of inducing the government's promisee to perjure himself while testifying, and the fear of inducing the government's promisee to "create" an offense where none exists. The vacated panel opinion in *United States v. Waterman*, 732 F.2d 1527 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985), focuses on the potential for a contingency agreement to induce perjury. In *Waterman*, the panel accepted the district court's determination that a plea agreement between the government and a witness who testified before the grand jury which indicted defendant constituted a contingency agreement. The district court found that the government agreed to provide more favorable treatment at the witness' sentencing if his testimony before the grand jury led to indictments. *Id.* The panel differed with the ultimate conclusion of the district court, however, by stating that the government could not, consistent with due process, offer the testimony of a witness who was party to such a contingency agreement. *See id.* at 1531. The panel stated, "Such an agreement is nothing more than an invitation to perjury having no place in our

constitutional system of justice." *Id.* The panel opinion was subsequently vacated by the equally-divided court *en banc*, thus affirming the trial court's determination that no constitutional violation took place. *Id.* at 1532.

No decision to date has embraced *Waterman* to find a due process violation. In *United States v. Dailey*, 759 F.2d 192 (1st Cir.1985), the First Circuit harshly criticized *Waterman*, commenting that the panel's decision was "unprecedented in modern times." *Id.* at 196. The First Circuit continued by stating, "Long ago the courts rejected the notion that the testimony of co-defendants and other interested witnesses was so likely to be unreliable that it should be excluded. Recognizing that such individuals were frequently the most knowledgeable witnesses available, the courts have chosen to allow them to testify and to rely upon cross-examination to ferret out any false testimony they might give." *Id.* (citations omitted).[1] *See also United States v. Valle-Ferrer*, 739 F.2d 545, 549 (11th Cir.1984) (per curiam) (rejecting the argument that reward contingent upon conviction rendered inadmissible the testimony of government informant).

Some courts, led by the Fifth Circuit in *Williamson v. United States*, 311 F.2d 441 (5th Cir.1962), *cert. denied*, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 724 (1965), have also expressed doubts about the reliability of investigative efforts of informants who have been promised rewards that are contingent upon the apprehension or conviction of suspects. The chief concern in this context is that an investigatory contingent arrangement might cause an informant to induce otherwise innocent persons to commit crimes they had no previous intent to commit. *Id.* at 444. Accordingly, several courts have either held or stated in dicta that due process is offended if the government agrees to pay an informant a reward for obtaining evidence about the criminal activities of a specified individual. *See*

---

**1.** It should be noted that although the First Circuit criticized the *Waterman* panel opinion, it did not have occasion to reject *Waterman*

because it found the facts of the case before it distinguishable from the facts in *Waterman*. *See id.* at 197.

*Valle-Ferrer*, 739 F.2d 545 (11th Cir.1984); *United States v. Joseph*, 533 F.2d 282 (5th Cir.1976), *cert. denied*, 431 U.S. 905, 97 S.Ct. 1698, 52 L.Ed.2d 389 (1977); *United States v. Cuomo*, 479 F.2d 688 (2d Cir.), *cert. denied*, 414 U.S. 1002, 94 S.Ct. 357, 38 L.Ed.2d 238 (1973); *Williamson*, 311 F.2d at 444.

Other courts have been unwilling to elevate the concern about reliability to the level of a due process violation. *See United States v. Hodge*, 594 F.2d 1163, 1166 (7th Cir.1979); *United States v. Grimes*, 438 F.2d 391, 394–95 (6th Cir.), *cert. denied*, 402 U.S. 989, 91 S.Ct. 1684, 29 L.Ed.2d 155 (1971). "These courts reject a *per se* exclusionary rule, arguing that a court's supervisory power should be sparingly exercised and expressing confidence in a jury's ability to consider the existence of a contingent-fee agreement in assessing an informant's credibility." *United States v. Chavez*, 620 F.Supp. 1516, 1520 (E.D.Pa. 1985), *aff'd mem.*, 787 F.2d 584 (3d Cir. 1986).

■ The Third Circuit has not expressed itself on either concern. Even if I were to follow *Williamson* and its progeny or the vacated panel opinion in *Waterman*, however, there would be no due process violation in this case. This is true simply because I find there was no contingency agreement between Ponzio and either the FBI or DEA.

Kinkle myopically focuses on the following interchange between defense counsel and Ponzio to conclude that Ponzio and the government had formed an agreement that was contingent upon Kinkle's conviction.

By Mr. Magarity:

Q. Now, you mentioned briefly to Mr. Becker that there was also a possibility at the end of the case that was suggested to you that there may be a money bonus, nothing promised, but it was suggested to you if the case is successful, that there may be some money in it at the end?

Mr. Becker: Objection to the mischaracterization of his testimony.

The Court: Sustained.

Mr. Magarity: Is that your understanding, sir, that if the case is successful, there is a possibility—no promise—of money for you at the end?

The Witness: Yes.

Q. Who told you that?

A. Ron Bosken.

Q. So the F.B.I., Ron Bosken is an F.B.I. Agent?

A. That is correct.

Q. The F.B.I. has told you at the end of the case without any guarantees, there might be additional money other than the monies that has already been paid?

A. That is correct.

Q. What about DEA, do you have a similar agreement with the DEA Agent Walter Jenkins? If the case is successful at the end, there may be a bonus for you?

A. No.

Q. Just with the F.B.I..?

A. Yes, he is the only one that actually said it to me.

Q. Did he suggest any amount?

A. No.

N.T. at 47–48 (May 30, 1985).

Kinkle chooses to ignore Ponzio's unrebutted later testimony, which shows that, at most, special agent Bosken mentioned to Ponzio that he could receive additional money at the conclusion of his cooperation, but that the payment of the money was not conditioned on the government's obtaining a conviction. *Id.* at 131–32, 135 & 143–44. Therefore, because there was no contingent agreement, neither of the two concerns is implicated, and there is no basis for a due process challenge.[2]

---

2. Although at one point Ponzio grudgingly admitted that he believed he would be more likely to receive a bonus if a conviction were obtained, N.T. at 143–44 (May 30, 1985), he steadfastly maintained that he did not believe he was going to get a bonus. *Id.* at 132, 134, 141.

Even if Ponzio reached the independent, subjective conclusion that he would have a better chance of getting a bonus if Kinkle were convicted, I believe it would be an unwarranted extension of either *Williamson* or *Waterman* to find due process to have been violated. I am

Kinkle next asserts that the court improperly admitted evidence of acts and statements of alleged co-conspirators which took place after he had withdrawn from the conspiracy.

The law in this circuit on withdrawal is firmly established. Once the government has demonstrated by a preponderance of the evidence that the defendant was a member of a conspiracy, the defendant must do more than show he has ceased contact with other co-conspirators. Instead, he must "present evidence of some affirmative act of withdrawal on his part, typically either a full confession to the authorities or communication to his co-conspirators that he has abandoned the enterprise and its goals." *United States v. De-Peri*, 778 F.2d 963, 980 (3d Cir.1985) (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978); *United States v. Steele*, 685 F.2d 793 (3d Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982)).

If the defendant has made a prima facie showing of withdrawal, the government then must rebut this showing either by impeaching the defendant's proof or by offering evidence that the defendant was engaged in conduct in furtherance of the conspiracy after the claimed act of withdrawal. *United States v. Steele*, 685 F.2d 793, 804 (3d Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); *United States v. Lowell*, 649 F.2d 950, 959–60 & n. 16 (3d Cir.1981).

I found and defendant does not seriously controvert that defendant was a member of a quaalude-distribution conspiracy prior to June, 1983. Consequently, the burden was on Kinkle to produce evidence of an affirmative act of withdrawal. In his post-trial motion, defendant attempts to shoulder this burden by pointing to language in three telephone conversations he had with Ponzio.[3]

First, Kinkle relies on his assertion to Ponzio in a June 8, 1983, telephone call that "I don't want you to be involved and I don't wanna be involved." *See* government transcript no. 4, at 5 (June 8, 1983). Second, he points to another call in the same day, in which he promises to provide Ponzio with his new telephone number but asks Ponzio not to give it to anyone else. Government transcript no. 5, at 2–4 (June 8, 1983). Finally, Kinkle relies on his statement to Ponzio on June 14, 1983, that Ponzio should not tell anyone else that he, Kinkle, was moving to Vero Beach, was "finished," and "just wants to relax." Government transcript no. 7, at 14, 19 (June 14, 1983). Kinkle asserts that these statements mean that he did not want any further dealings in the conspiracy.

Even if these statements are given the meaning that Kinkle now seeks to attribute to them, Kinkle has not made a prima facie showing of withdrawal. In order for a communication of withdrawal to provide a prima facie showing of withdrawal, that communication must be reasonably calculated to reach the withdrawing conspirator's co-conspirators. *See United States Gypsum Co.*, 438 U.S. at 464, 98 S.Ct. at 2887; *United States v. Gillen*, 599 F.2d 541 (3d Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979). I cannot find and Kinkle has not explained how these statements, made only to one co-conspirator, were reasonably calculated to reach any other co-conspirators that Kinkle knew.[4]

aware of no decision where the possibility of a bonus that was not made contingent by the government was found to have violated due process.

**3.** It is at least questionable whether defendant can now support his evidentiary objection with this offer. Federal Rule of Evidence 103 requires a proper objection to be made at trial. From the trial transcripts and the brief that defense counsel submitted at trial, it is clear that counsel only argued at trial that the government could produce no evidence that Kinkle remained in the conspiracy. Because a mere cessation of contact between conspirators is insufficient to demonstrate withdrawal, it was proper for me to admit the evidence over the objection counsel raised.

**4.** This is not to suggest that in order to withdraw a co-conspirator must actually notify each

Moreover, even if these verbal acts are sufficient to demonstrate a prima facie case, the government has proven that Kinkle was still a member of the conspiracy as of June 14, 1983. First, he takes the language upon which he relies out of context. Prior to June, 1983, Kinkle had begun to argue with another co-conspirator, Clifford Shinn. Ponzio had begun to argue with yet another co-conspirator, Steve Malta. Evidently, Malta and Shinn also were feuding at this time. Kinkle's purported withdrawal statements pertain only to his desire to disassociate himself from Shinn and the battle in which Shinn and Malta were engaging. The government's evidence showed Shinn, Malta, Ponzio, and Kinkle were not the only members of this conspiracy.[5] Therefore, Kinkle's statement expressed at most only the desire not to be personally involved with one and possibly two members of a much larger conspiracy, not to withdraw from the conspiracy itself.

Furthermore, in the very conversations on which Kinkle relies to show withdrawal, Kinkle demonstrates a willingness to consummate additional quaalude transactions with Ponzio. Two days before the June 8, 1983, conversation, Ponzio met Kinkle at the Cove Restaurant in Deerfield Beach, Florida, and told Kinkle that he would be unable to repay Kinkle $20,000 he owed for prior drug deals. N.T. at 14 (May 30, 1985). Kinkle told Ponzio that Ponzio could work off the debt by doing future drug deals, including bootleg quaalude transactions. Id. at 15. During the first telephone conversation of June 8, 1983, Ponzio and Kinkle discuss that they have "business to take care of" and that they will get their "act together." Government transcript no. 4, at 3, 5 (June 8, 1983). In the second conversation on June 8, 1983, they discuss Ponzio's making a payment on the "car," and the possibility of Kinkle's

obtaining the "rest of the parts" of the "car." Government transcript no. 5, at 2 (June 8, 1983). Ponzio testified that this meant that he was to make a payment on his balance for prior drug transactions and that he wanted to obtain additional quaaludes from Kinkle. N.T. at 20–21 (May 30, 1985).

On June 14, 1983, Ponzio and Kinkle talk about Ponzio's making a "deduction," which Ponzio interpreted as meaning that he wanted to purchase some additional quaaludes and reduce his balance. Government transcript no. 7, at 1–2 (June 14, 1983); N.T. at 23 (May 30, 1985). In that same conversation, they discuss doing a little "boxing," which Ponzio testified meant boxes of quaaludes. Government transcript no. 7 at 2, 6, 11, 14 (June 14, 1983); N.T. at 23–24, 26, 28–29 (June 14, 1985).

From Ponzio's testimony and the June, 1983, conversations, I conclude that Kinkle wanted to collect money Ponzio owed to him and consummate additional drug deals. Consequently, I find that even if Kinkle made a prima facie showing of withdrawal, the government proved that Kinkle remained a member of the conspiracy.

There was adequate, independent non-hearsay evidence establishing the existence of the conspiracy and connecting the declarants and the defendant to that conspiracy. The statements were made in furtherance of the conspiracy and during the course of the conspiracy. Therefore, it was proper to admit the statements. Similarly, it was not error to have admitted evidence of the acts of co-conspirators that took place after June, 1983.[6]

Finally, Kinkle claims that this district was an improper venue for the telephone count. This argument was rejected prior

other co-conspirator. See United States Gypsum Co., 438 U.S. at 464 n. 37, 98 S.Ct. at 2887 n. 37.

5. The evidence showed that Mr. Kinkle had direct dealings with Rob DeAngelis, and indirect dealings with Michael Beaulieu, Marcel Lavigne, and Thomas Mazzoni.

6. Even assuming Kinkle had withdrawn from the conspiracy, the evidence of transactions that took place after June, 1983 was relevant to demonstrate Kinkle's quaalude source. Although this basis would not have justified the admission of statements, their admission would constitute harmless error.

to trial. *See United States v. Kinkle*, 624 F.Supp. 629 (E.D.Pa.1985). The facts upon which my earlier opinion was predicated do not vary from those adduced at trial. Because I believe my pre-trial opinion is correct, Kinkle's venue objection is rejected.