UNITED STATES of America

v.

Samuel GARDNER.

Crim. No. 86–200.

United States District Court, W.D. Pennsylvania.

May 6, 1987.

Elliott McLean, Asst. U.S. Atty., for plaintiff.

Thomas S. White, Federal Public Defender, for defendant.

HISTORY, FINDINGS OF FACT,
CONCLUSIONS OF LAW,
OPINION AND ORDER

SIMMONS, District Judge.

HISTORY

1. The federal grand jury sitting in the United States District Court for the Western District of Pennsylvania returned a true bill against the defendant on September 24, 1986, charging the defendant Samuel L. Gardner with two counts of unlawful distribution and possession with intent to distribute a quantity of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21 U.S.C. 841(a)(1). Alleged offenses occurred on July 10, 1986, and on July 18, 1986, respectively.

2. Defendant thereafter was arraigned and entered a plea of not guilty.

3. Defendant's original counsel was permitted to withdraw and the Office of the Federal Public Defender was appointed to represent him. An extension of time in which to file motions was granted by this Court to the Federal Public Defender's Office.

4. Among the motions that the defendant filed was a timely Motion to Dismiss based on the defendant's assertion that the government violated his due process rights, with a citation of authorities.

5. The Court ordered that the parties brief this issue.

6. A hearing on this motion was held on December 5, 1986, and December 8, 1986.

7. At this hearing, the defendant presented three witnesses: Charise Thrasher, Othneil Lineberg and James Hill. The Court also heard the defendant testify pursuant to Rule 104 of the Fed.R.Evid.

8. The Government elected not to present any evidence of any kind in its behalf.

FINDINGS OF FACT

Based on the defendant's motion and the admissions made by the government in its response to that motion, and the government's brief as well as the testimony of the witnesses, the Court makes the following findings of fact and conclusions of law:

9. Sometime in the summer of 1986, Mr. Earl Heintzinger agreed to act as an informant for the United States Postal Inspectors. The Postal Inspectors assisted him in obtaining an 89 day temporary appointment as a postal worker for the purpose of facilitating their narcotics investigation at the Pittsburgh General Mail Facility (Paragraph 4 of Government's Response to Defendant's Motion to Dismiss Indictment and Memorandum of Law filed December 3, 1986). (H.T. 81, 82)

10. Throughout the time when Mr. Heintzinger dealt with the defendant Gardner, he was an agent of the government. *See Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). H.T. 82, 89)

11. During the month of June, 1986, Earl Heintzinger a/k/a Big Bob, a/k/a Big Robb, while working at the General Mail Facility on the North Side of the City of Pittsburgh continually asked Sam Gardner to obtain drugs for him, specifically cocaine. (H.T. 7, 9, 15)

12. On at least four occasions Heintzinger went out drinking with Mr. Gardner and flashed large amounts of money in front of Mr. Gardner. On several occasions, Mr. Heintzinger suggested they go to the Diamond Cafe in Market Square after they finished their work at the post office at approximately 6:30 A.M. (H.T. 7, 9, 11)

13. Heintzinger told Gardner that he had another job where he worked on city vehicles. Mr. Gardner at that time owned a 1974 automobile that needed considerable body work done on it including replacing the doors. Mr. Heintzinger told him that he would assist him in finding replacement doors and installing them if Mr. Gardner would assist him in acquiring drugs. (H.T. 7, 8, 9)

14. Gardner had no prior record and had never sold any drugs before. (H.T. 25, 101)

15. Gardner was reluctant to become involved and told Heintzinger that he did not know where to get any cocaine. (H.T. 9, 15)

16. Near the end of June, many of the casual employees employed by the post of-

fice at the General Mail Facility on the North Side of the City of Pittsburgh, aware that their employment at the postal facility was coming to an end, planned a party. H.T. 12, 15, 34)

17. After finishing their work on June 28, 1986, at about 6:30 A.M., many of the casual employees as well as some of the permanent employees met at the Stone Front Bar near the General Mail Facility. Heintzinger sat with Gardner and Lineberg, who had also just finished work at the post office that morning. Lineberg overheard Heintzinger ask Gardner if he could get some cocaine but he did not hear any response from Gardner. (H.T. 12, 13, 15, 37)

18. Because the waitress refused to serve Heintzinger any more drinks, and the party was breaking up, Gardner and Lineberg decided to continue the celebration elsewhere. Gardner, Lineberg and Heintzinger left the Stone Front Bar and proceeded to James Hill's house who lives a short distance from the Stone Front Bar. (H.T. 15, 16, 17, 18)

19. James Hill is also employed at the General Mail Facility on the North Side. Mr. Gardner and Hill are close friends. When Mr. Gardner, Lineberg and Heintzinger arrived at Hill's apartment, a great number of people were milling about because the landlord was changing the locks on all the doors. Mr. Gardner and Mr. Lineberg had alcoholic beverages with them and when they entered the apartment a number of people from the other apartments joined them. After admitting Gardner and the others, Hill only stayed a few minutes in the apartment's living room before retiring to the bedroom. After having a few drinks, Mr. Lineberg left to pick up Charise Thrasher. Upon his return with Ms. Thrasher, Lineberg heard Heintzinger again ask Gardner to see if he could get him some cocaine. Gardner began asking people at the party if they had any cocaine and eventually found someone who had cocaine with him. Gardner gave cocaine to Heintzinger and Heintzinger gave money to Gardner for the Cocaine. Heintzinger then laid the cocaine out in lines and "snorted" the entire amount of cocaine and he did thereby violate the laws of the United States. He then asked Gardner to get

him some more which Gardner did and Heintzinger paid for that also. Each time Gardner merely acted as a go-between for the party having the cocaine and Heintzinger. (H.T. 19, 20, 21, 23, 24, 25, 26)

20. At this time, Ms. Thrasher stated, out of the hearing of Heintzinger, that she believed that they should get him out of Mr. Hill's apartment. The reason for this was that Heintzinger was becoming boisterous. Gardner told Heintzinger that he, Lineberg and Ms. Thrasher were leaving the party and because they had brought him, they would take him home. (H.T. 22, 23, 61, 62)

21. Heintzinger got into the back seat of Gardner's car next to Mr. Lineberg. Gardner drove the car and Ms. Thrasher sat in the passenger seat. (H.T. 23, 28, 44, 63, 70)

22. During the drive to Mr. Heintzinger's home on the South Side of the City of Pittsburgh, Heintzinger snorted the second baggie of cocaine he had acquired through Gardner, and Heintzinger for the second time violated the laws of the United States. (H.T. 23, 24, 29, 44, 63, 70, 71)

23. Lineberg, Thrasher and Gardner returned to James Hill's house and the party went on until Ms. Thrasher became ill, and at which time Gardner, Thrasher and Lineberg left. (H.T. 30, 64)

24. During the early part of July, 1986, Heintzinger persisted in asking Gardner to get him cocaine. Eventually Gardner consented to do so and went to several jitney stations in his neighborhood until he found where some cocaine was available. He was informed that an eighth of an ounce of cocaine would cost $350. He reported this to Heintzinger who gave him the $350. On July 10, 1986, Gardner delivered the eighth of an ounce of cocaine to Mr. Heintzinger at the postal facility. Mr. Gardner made no profit on this transaction. (H.T. 24, 27, 28, 39, 40)

25. Near the middle of July, Heintzinger gave Mr. Gardner $1,000 in U.S. currency and told him to attempt to get cocaine for him. Mr. Gardner reported within two days that he could not find any cocaine and offered to give the money back to Heint-

zinger. Heintzinger told him to keep it and keep trying. Gardner finally acquired some cocaine for $165, and a quantity of what he understood to be opium for $200, which he delivered to Heintzinger at the General Mail Facility on or about July 18, 1986. Gardner returned $635 to Heintzinger. (H.T. 28, 41)

26. The defendant Gardner has no prior criminal felony record. He has served seven years in the United States Marine Corp and received an honorable discharge. He has worked seven years for the United States Post Office. He is married and has four minor children. (H.T. 3, 4, 25)

27. Gardner had no prior involvement with drugs until Earl Heintzinger requested that Gardner get cocaine for him; the Government was Gardner's only customer. (H.T. 25)

28. Heintzinger undeniably badgered, cajoled, induced, inveigled and utilized his position as a postal employee to acquire Gardner's friendship and utilized promises of assisting him in repairing his car to induce Gardner's cooperation in obtaining Heintzinger drugs for his personal use. (H.T. 7, 9, 10)

29. The Government moved to strike off the record all of Mr. Heintzinger's testimony and refused to allow Heintzinger to be cross-examined by the defendant's attorney and offered no other evidence.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction for this case pursuant to Title 18 U.S.C. § 3231. Defendant's rights under the Due Process Clause have been violated by virtue of the fact that he was badgered, implored, inveigled and purposely set up by an agent of the Government in order to allow the government to prosecute and convict him.

2. Defendant Gardner had no previous predisposition of any kind to violate the law. Defendant had no prior criminal record. He was honorably discharged from the Marines and he had been gainfully employed for seven years in the United States Post Office.

3. The Court is shocked by the lack of supervision exercised by by the Postal Inspectors over its informant and the allowing of the psychological coercion of Gardner by informant Heintzinger to acquire drugs for him. The government here through its informant created crime rather than uncovered crime and as such engineered and directed the criminal enterprise from start to finish. *See United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983).

4. I find that the government initiated and was actively involved in the criminal enterprise itself. *See United States v. Twigg*, 588 F.2d 373 (3rd Cir.1978)

5. Although the government did not supply the drugs in the case, it supplied the other necessary ingredients, the money to ferment criminal activity. *See Twigg, supra.*

6. Just as a defendant's lack of prior criminal involvement is relevant to an entrapment defense, so is it relevant to a claim of outrageous government conduct. *See Green v. United States*, 454 F.2d 783 (9th Cir.1971; *United States v. Batres-Santolino*, 521 F.Supp. 744 (M.D.Calif.1981)

7. The Defendant in this case has met for the four prong test for overturning a conviction on due process grounds set forth in *United States v. Bogart*, 783 F.2d 1428, footnote 7 at page 1435 (9th Cir.1986) as follows:

(a) This Court finds that the crime alleged by the Government in the indictment in the above-captioned case would not have occurred but for the Government's assistance in manufacturing the crime; and further, this Court finds that up to the time of the inception of the alleged crime now before this Court, the Defendant was *not* involved in any prior ongoing criminal activity of any kind.

(b) It is clear beyond doubt and it is not contested by the Government and this Court finds that the Government's Agent committed at least two Federal crimes during the course of this defendant's alleged criminal activity and of great importance is the fact that the Government was the one and only customer of the Defendant Gardner.

(c) Again, it is clear beyond doubt and it is not contested by the Government and

this Court finds that the Government Agent persisted over a period of time in inducing and pursuading the Defendant to commit the crime in question with sole motive and intention of overcoming the obvious reluctance of the Defendant to commit the alleged crime in question.

(d) The Government does not deny that its sole motive and the motive of the Government Agent Heintzinger was to obtain a conviction and in fact the Government is attempting to obtain a conviction of the defendant in this case and this Court so finds that the above described actions of the Government and the Government's Agent in this case was solely and entirely motivated by a desire to convict the defendant of a crime that was encouraged and supported by criminal activities of the said Government Agent since the Government was the one and only customer of the Defendant Gardner.

8. The defendant is entitled to the granting of his Motion to Dismiss the Indictment against him since the Court finds that the conduct of the law enforcement officials is so outrageous that due process of law principles would bar the government from securing a conviction. *See United States v. Russell,* 411 U.S. 423, 431-32, 93 S.Ct. 1637, 1642-43, 36 L.Ed.2d 366 (1973); *United States v. Jannotti,* 673 F.2d 578, 606 (3rd Cir.1982); *United States v. Twigg,* 588 F.2d 373, 379 (3rd Cir.1978).

9. This Court has exercised scrupulous restraint before [denouncing] this law enforcement conduct as constitutionally impermissible. *Janotti,* 673 F.2d at 607. This judicial restraint is particularly appropriate in the narcotics-prosecution context. However, the undisputed facts spell out outrageous governmental conduct in this case which shocks the conscience of this Court. This Court is particularly pursuaded to come to this conclusion by the Government's action in asking this Court to strike off the record all of its evidence and by the Government's refusal to submit its agent Heintzinger to the defendant's cross-examination.

10. However, in *United States v. Ward,* 793 F.2d 551, 554 (3rd Cir.1986), our Court of Appeals, as late as June of last year, stated "[t]hus far the precise nature of the *Twigg* defense remains unclear" citing *United States v. Janotti,* 673 F.2d 578, 606 (3rd Cir.) (en banc) *cert. den.,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

It is the legal conclusion of this Court that the undisputed conduct of the Government Agent in this case reached a demonstrable level of outrageousness which compels this Court to grant the Defendant's Motion to Dismiss the indictment.

OPINION

■ This is *not* an entrapment case. The question here is whether—regardless of the Defendant's predisposition to commit a crime—the governmental agents have acted in such a way as is likely to instigate or create a criminal offense. *See United States v. Russell,* 411 U.S. 423, 431, 432, 93 S.Ct. 1637, 1642, 1643, 36 L.Ed.2d 366 (1973). Thus, the focus of this approach is not on the propensities and predisposition of the specific defendant, but on "whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." *See Sherman v. United States,* 356 U.S. 369, 382, 78 S.Ct. 819, 825, 2 L.Ed.2d 848 (1958). Under this approach, the determination of the lawfulness of the government's conduct must be made—as it is on all questions involving the legality of law enforcement methods—by the trial judge, not the jury.

■ In the instant case, regardless of whether the subjective or objective approach is used, it is clear that Mr. Gardner's rights were violated. There has not been a scintilla of evidence submitted by the government that shows any predisposition on the part of Mr. Gardner, the Defendant in this case. Rather, what is clearly shown is that Defendant Gardner repeatedly told Heintzinger, the Government Agent, that he did not know where to get cocaine and, in fact, tried to return money given him by Heintzinger which Heintzinger refused. Defendant Gardner has no prior criminal record. He was honorably dis-

charged from the Marines, and has been gainfully employed for seven years by the United States Post Office. The testimony presented at the hearing on this matter almost entirely goes to the shocking conduct of the government in creating a crime just for the sake of obtaining the conviction of an otherwise innocent individual. The Government refused to offer direct evidence or rebuttal evidence.

A number of courts have analyzed the conduct of the government in determining whether such conduct constituted a due process violation. In *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), a majority of the court recognized the potential availability of an outrageous police conduct defense no matter what the defendant's criminal disposition. *Id.* at 497, 96 S.Ct. at 1653.

The Eighth Circuit Court of Appeals in *United States v. Lard*, 734 F.2d 1290 (8th Cir.1984) noted, in reversing the defendant's convictions on the ground that they may have been entrapped as a matter of law, observed:

"Finally, we should add that, apart from the entrapment defense, Agent Anderson's overinvolvement in conceiving and contriving the crimes here approached being 'so outrageous that due process principles should bar the government from invoking judicial process to obtain a conviction.' *See United States v. Russell supra* [411 U.S.] at 431–32 [93 S.Ct. at 1642–43]; *United States v. Twigg supra* at 379; *United States v. McCaghren*, 666 F.2d 1227, 1230–31 (8th Cir.1981). Anderson's conduct was not aimed at facilitating discovery or suppression of ongoing illicit dealings in unregistered firearms. Rather, it was aimed at creating new crimes for the sake of bringing criminal charges against *Lard*, who before being induced, was lawfully and peacefully minding his own affairs. *See United States v. Twigg, supra.* The government's agents' overzealous efforts to instigate crime also involved rather extreme and questionable measures, including smoking of marijuana to gain *Lard's* confidence and lure him into committing a crime he was not otherwise ready and willing to commit. Concepts of fundamental fairness preclude us from putting our imprimature on law enforcement overreaching conduct designed to instigate "a criminal act by persons 'otherwise innocent in order to lure them to its commission and to punish them.'" *Russell*, 411 U.S. 428–9 [93 S.Ct. at 1641] ... *Id.* at 1296–97."

█ The history of the "due process defense" begins with *U.S. v. Russell*, 411 U.S. 423 at 431–32, 93 S.Ct. 1637 at 1642–43, 36 L.Ed.2d 366. There the Court did not set forth a definitive outline of this defense but noted that a court could be presented with a situation in which "the conduct of law enforcement is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction."

The Court of Appeals for the Third Circuit in *U.S. v. Twigg*, 588 F.2d 373 (3rd Cir.1978), said "... This egregious conduct on the part of government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs. Fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred."

Other cases in this Circuit, when presented with the question involving the due process defense have failed to find any due process violation and have noted that the Court of Appeals for this Circuit have not delineated the defense: *See U.S. v. Jannotti*, 673 F.2d 578 (3rd Cir.1982); *U.S. v. Beverly*, 723 F.2d 11 (3rd Cir.1983); *U.S. v. Ward*, 793 F.2d 551 (3rd Cir.1986), decided June 20, 1986; *U.S. v. Gambino*, 788 F.2d 938 (3rd Cir.1986); *U.S. v. Chavez*, 620 F.Supp. 1516 (D.C.Pa.1985); *U.S. v. Kinkle*, 631 F.Supp. 423 (E.D.Pa.1986).

Subsequent to *Twigg*, in *United States v. Beverly*, 723 F.2d 11 (3rd Cir.1983) (per curiam), the Court stated that it was not prepared to conclude that the police conduct in that case "shocked the conscience" so as to mandate acquittal to protect the Constitution. However, *Beverly* is clearly distinguishable from the instant case. There, the defendant had boasted to a federal agent that he was an experienced arsonist and the agent offered him $3,000 to burn a building. There are no such indications present in this instance, and as *Twigg* has never been overruled in this Circuit, dismissal of the indictment under the outrageous and shocking circumstances presented here is appropriate.[1]

The Court of Appeals for the Ninth Circuit has outlined the test for the defense of violation of due process. In *U.S. v. Bogart*, 783 F.2d 1428 (9th Cir.1986), the Court of Appeals reviewed the law on the due process defense and concluded:

We have not accepted the view that this highly discreet group of extreme cases of police brutality defines the limits of unconstitutional outrageous governmental conduct. We have held that law enforcement conduct also becomes constitutionally unacceptable 'where government agents engineer and direct the criminal enterprise from start to finish,' ... or when governmental conduct constitutes 'in effect, the generation by police of new crimes merely for the sake of pressing criminal charges against the defendant.'.... our view, shared by Justice Brandeis, that a crime manufactured by the government 'from whole cloth' would constitute outrageous conduct also has a firm jurisprudential basis.... where the police control and manufacture a victimless crime, it is difficult to see how anyone is actually harmed, and thus punishment ceases to be a response, but becomes an end in itself—to secure the conviction of a private criminal.... under such circumstances, the criminal jus-

tice systems infringes upon personal liberty and violates due process".

■ The *Bogart* court notes in footnote 7 at page 1435 that the Court of Appeals has suggested a four factor test for overturning a conviction on due process grounds:

(1) Whether the crime would not have occurred but for the government's assistance in manufacturing the crime or whether the defendant were already involved in ongoing criminal activity;

(2) Whether the government's agents committed crimes or otherwise acted improperly;

(3) Whether the government's agents persisted with their inducements to overcome the defendant's reluctance to commit the crime; and

(4) Whether the government's agents sole motive was to obtain a conviction. *See People v. Isaacson*, 44 N.Y.2d 511, 521, 406 N.Y.S.2d 714, 719, 378 N.E.2d 78, 83 (1978). *See also U.S. v. Batres-Santolino*, 521 F.Supp. 744 (N.D.Cal. 1981), where the District Court dismissed the case on due process grounds noting that the crime could not have nor would have been committed except for the fact that the informant inveigled the defendant into it; *See U.S. v. Valdovinois-Valdovinois*, 588 F.Supp. 551 (N.D.Cal.1984) where the District Court found due process violation where the INS set up an undercover telephone and disseminated the number in Mexico and advised Mexican nationals to violate U.S. law, because this action of the INS placed law enforcement agents squarely in the middle of the creative act.

This Court in the case at bar has applied the four factor Bogart test to the undisputed facts and has determined as a matter of law that the Defendant Gardner has satisfied each prong of said test and this Court has concluded as a matter of law that Defendant's "due process defense" has been

---

1. Also note that the Court of Appeals in New York in the case of *People v. Isaacson*, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978) dismissed an indictment on the grounds that the

police conduct, when tested by due process standards, was so egregious and deprivative as to impose upon the court an obligation to dismiss. *Id.*, 406 N.Y.S.2d at 717, 378 N.E.2d at 81.

made out and that Defendant Gardner's Motion to Dismiss shall be granted.

An appropriate Order shall be entered.