FILED
United States Court of Appeals
Tenth Circuit

November 2, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOHN DOE,

Defendant-Appellant.

No. 11-1084

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

---

David M. Koppa, Colorado Springs, Colorado, for Appellant.

Barbara S. Skalla, Assistant United States Attorney (John F. Walsh, United States Attorney, with her on the brief), Office of the United States Attorney, Denver, Colorado, for Appellee.

---

Before **MURPHY**, **HARTZ**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

John Doe pleaded guilty to two drug trafficking charges in a plea bargain.[1] Prior to the plea deal, he filed a motion to dismiss the indictment for breach of an immunity agreement and outrageous governmental conduct. The district court denied the motion.

In the plea agreement, Doe did not negotiate a conditional plea in which he retained the right to appeal the court's ruling, so he cannot appeal unless he can establish a basis for us to ignore the appeal waiver. He attempts to do so by contending (1) the government cannot force the waiver of an immunity agreement on due process grounds; and (2) even if he could waive immunity, outrageous government conduct is an implied exception to any appeal waiver. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we find that Doe lacks a basis to bring the appeal and the facts of the case do not implicate the outrageous governmental conduct exception. Accordingly, we AFFIRM Doe's conviction, DISMISS his appeal, and GRANT his motion to seal the briefs.

## I. Background

Doe was incarcerated on unrelated charges at the Weld County jail in Colorado. He was approached by Stephen Schulz, a detective with the Longmont, Colorado, Police Department (LPD). Schulz was investigating a local drug

---

[1] Pursuant to appellant's motion, which we now grant, we will refer to him as John Doe throughout this opinion. We direct the clerk of court to change the caption accordingly. We also direct the clerk of the court to seal the entire record on appeal.

trafficking organization and believed that Doe could become a confidential informant (CI) for the LPD for the purpose of providing insider information.

During their first meeting, Doe provided an overall view of the target trafficking organization and offered information about how well he knew certain members of the organization. In a subsequent meeting, Doe was taken to the offices of the LPD, where Schulz laid out the ground rules of a CI relationship. More specifically, Doe would be required to enter the LPD's standard form Working Agreement that it uses with informants.

Provisions of the Agreement required Doe to heed certain rules of conduct. For instance, he was asked to make the following commitments: "I agree to strictly abide by and not violate any laws including narcotic and drug laws"; "I will not sell, deliver, or possess any controlled substances, illegal or illicit drugs, or any substances . . . at any time"; "I understand that any violations of the code of conduct, or any violations of law will be fully investigated with an appropriate action being taken, including criminal prosecution for any criminal violations." R., Vol. III at 70–71, 103. Schulz was very specific with Doe, telling him: "you can't violate any laws," *id.* at 73, and that "participating in the fact of being there and gaining information . . . is different than participating and gaining information and then committing crimes on top of that." *Id.* at 74. Doe did not sign the Agreement, ostensibly to protect his identity, but he proceeded to provide information to Schulz.

Doe received his first payment of $160 while he was still in the Weld County jail, in exchange for information concerning his associates' phone numbers, addresses, and automobiles. Once released from jail, Doe was approached by two members of the organization, who asked him about working for them distributing cocaine. Doe contacted Schulz about this development. A few weeks later, in April 2008, Doe provided Schulz with details about an upcoming three-kilogram cocaine pick-up in New Mexico. On the strength of the information, one of the members of the organization was arrested. Schulz paid Doe $500 for this information.

That arrest had consequences. According to Doe, after this arrest, everyone within the organization "was scared," and suspicious, since only a handful of people had known about the cocaine pick-up that led to the arrest. *Id.* at 22. After this point, Doe admits that he only passed "bits and pieces" of information along to Schulz. *Id.* at 21. Doe also told Schulz that he was going to need to begin "running ounces of cocaine" in order to alleviate suspicion. *Id.* at 123. Schulz testified he told Doe that he "can't do that," and that if he did, Doe would be "on his own." *Id*. at 123, 125.

While both Doe and Schulz agree they did not discuss an immunity deal at this time, Doe claims Schulz told him to "do what you got to do" to "stay in with these guys," "[j]ust don't get in trouble." *Id.* at 31. Schulz also told Doe that if he got pulled over in Longmont to let the local police know that he was working

-4-

with Schulz. Doe later testified he understood this conversation to be an offer of immunity, but no further discussion was held as to the scope of any immunity agreement. Schulz testified that he understood the conversation to mean that "he is not allowed to commit any crimes and if he gets caught doing any crimes he's on his own at that point and then we will see where we can go with the DA's office . . . depending what the crime is." *Id.* at 95.

After the conversation, Schulz and Doe spoke much more infrequently, with only a handful of conversations between April and November 2008, mostly for the purpose of "checking on [Doe]." *Id.* at 110. During this time, Doe continued working for the organization—picking up and delivering cocaine. But by then he was being paid in cocaine that he resold for income. By then, Doe also admitted he was no longer furnishing complete information to Schulz. At the same time, Schulz began working with the Front Range Drug Task Force, a federal unit involving the Drug Enforcement Administration (DEA). The task force was collecting evidence for the purpose of supporting an application for a wiretap on the organization. The wiretap application was approved, and the wiretap began in the fall of 2008.

On October 22, 2008, officers overheard Doe on the wiretap trying to collect money from a drug customer for the organization, and informed Schulz. Schulz carefully documented his conversations with Doe at this time, ultimately recording thirteen contacts between November 14, 2008 and January 5, 2009.

In December 2008, Doe received his final two payments from Schulz. In both instances, Doe provided intelligence to Schulz about members of the organization, receiving $170 and $80 in exchange. The $170 payment was provided for the purpose of getting Doe's car out of an impound lot in a neighboring town. Schulz's notes reflect that he knew the car was being used by the organization and that Doe was returning it for the purpose of trying to pay off a debt.

On December 23, 2008, Schulz was informed that a phone call involving Doe had been intercepted. He learned that Doe was going to a nearby house and Schulz was asked to do surveillance on the residence. Doe proceeded to the house for the purpose of picking up four ounces of cocaine. While there, Doe thought that he spotted two unmarked police cars nearby, but proceeded to make the pick-up anyway. After making the pick-up, Doe called Schulz and asked whether he knew of any undercover vehicles that might be following him. Schulz was actually driving the car following Doe, but he only told Doe that the gang unit might be in the area. This evasion was done "to protect the integrity of the case." *Id.* at 95.

Despite knowing that Doe was directly involved in criminal activity, Schulz continued accepting information from Doe, until Doe's arrest for an unrelated matter in February 2009. Once he was arrested, Doe claimed he believed he was still involved in a CI relationship with Schulz, and continued to provide

information about the organization, until he was indicted in this case in April 2009.

After his indictment, Doe filed a motion to dismiss the indictment on two grounds. First, he contended the government breached an immunity agreement, which arose from his relationship with Schulz. He also argued the government's conduct in encouraging his ongoing relationship with the organization and the crimes he committed to maintain his cover amounted to outrageous conduct, justifying dismissal of the charges. He asked the district court to dismiss the indictment to protect the integrity of the judicial process.

The district court held a hearing on the motion and received testimony from both Doe and Schulz. The district court denied the motion. The court found the evidence did not support the claim that an immunity agreement had been formed. Although Schulz should have terminated the confidential relationship once he knew that Doe was committing crimes, Schulz unambiguously warned Doe not to commit crimes in his role, and therefore the relationship was "limited to the exchange of information for money" and did not include either an express or an implied promise of immunity. R., Vol. II at 82.

As to the outrageous governmental conduct claim, the district court concluded that, while Schulz "undoubtedly contributed to [Doe's] misunderstanding," *id.* at 87, Doe failed to sustain his burden of showing governmental creation of the crime and substantial coercion. In sum, the court

concluded that while Schulz's failure to terminate the relationship once he knew that Doe was committing crimes was "not to be applauded," it was not unlawful. *Id.*

Doe chose to enter unconditional guilty pleas, pursuant to a written agreement, to two of the counts against him.  In exchange, two additional counts were dismissed.  He was sentenced to 48 months' imprisonment and one year of supervised release.

## II.  Discussion

We consider two issues: (1) whether Doe waived his right to challenge the district court's rulings when he entered a plea agreement, and (2) whether the government's conduct nonetheless provides grounds to vacate the plea agreement and dismiss the indictment.

### A.  *Waiver of Claims*

Doe first argues that the district court wrongly concluded no immunity agreement had been reached and as a matter of law he is entitled to its protection from prosecution.  Doe advanced a similar argument in the district court in a motion to dismiss.  Yet Doe then entered an unconditional guilty plea, in which he admitted: "I know that if I plead guilty, there will be no appellate review of the question of whether or not I am guilty . . . . [and] that any . . . appellate review will extend only to the question of whether a proper sentence was imposed."

-8-

By entering into an unconditional guilty plea agreement, a defendant normally waives the right on appeal to attack the district court's denial of a motion to dismiss. Generally, once "a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). He "may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the [applicable] standards." *Id*.

Doe makes two arguments to avoid a waiver problem. First, he contends his claim relates to the subject matter jurisdiction of the district court and therefore cannot be waived. Second, he argues that an exception to the waiver rule exists for certain categories of constitutional violations, which cannot be waived by a guilty plea, and that the violation he suffered fits within this exception.

Both of these arguments are similar to those we recently addressed in *United States v. De Vaughn*, 694 F.3d 1141 (10th Cir. 2012). In *De Vaughn*, we considered claims raised by a defendant who had posted hoax anthrax letters to a number of public officials and then pleaded guilty to mailing threatening communications in violation of 18 U.S.C. §§ 871, 875(c), 876(c), and 1038(a)(1). *Id*. Despite entering an unconditional guilty plea, the defendant attacked the

validity of the charges against him by arguing that his conduct did not constitute a "threat" for purposes of the statute and that the statute, as applied to him, violated his First Amendment rights. *Id*.

Similar to Doe, the defendant in *De Vaughn* attempted to avoid the waiver problem created by his guilty plea by suggesting that these alleged defects in the indictment would have deprived the district court of subject matter jurisdiction. *Id*. at 1146. Further, just as Doe asks us to consider the jurisdictional import of his due process claim, in *De Vaughn*, we analyzed the same issue in the context of the defendant's First Amendment challenge. *Id*. at 1149–50.

Our holding in *De Vaughn* is fatal to Doe's attempts to avoid waiver. First, *De Vaughn* demonstrates how Doe erroneously characterizes his claim as related to subject matter jurisdiction and is therefore non-waivable. In support of this proposition, Doe relies on *United States v. Cotton*, 535 U.S. 625, 630 (2002). While the Supreme Court in *Cotton* did reiterate the uncontroversial proposition that attacks on subject matter jurisdiction are non-waivable, *id*. at 630, Doe does not suggest how subject matter jurisdiction is implicated in his case.

Further, as we noted in *De Vaughn*, the Court in *Cotton* also held that "defects in an indictment do not deprive a court of its power to adjudicate a case." 535 U.S. at 630; *see also De Vaughn*, 694 F.3d at 1147. In other words, a defect in an indictment does not deprive a court of subject matter jurisdiction: any

allegations that an indictment is defective are non-jurisdictional and waivable.[2] Thus, although it is unclear whether Doe raises this particular claim, to the extent he suggests that the indictment issued against him is defective because of problems with the immunity agreement, *Cotton* is of no aid to his waiver problem.

To be sure, Doe may have assumed that he needed to characterize his claim as *jurisdictional* in order to avoid waiver. Such an assumption might have been warranted before *De Vaughn*, when we reconsidered our oft-cited holding in waiver cases that "a voluntary and unconditional guilty plea *waives all non-jurisdictional defenses*." *De Vaughn*, 694 F.3d at 1145 (emphasis added) (quoting *United States v. Salazar,* 323 F.3d 852, 856 (10th Cir. 2003)). As we noted in *De Vaughn*, however, this holding is technically incorrect: the Supreme Court has recognized two forms of *non-jurisdictional* claims that are not waived by a guilty plea. *Id.*

The first exception, recognized by the Supreme Court in *Menna v. New York*, 423 U.S. 61, 61–62 (1975) (per curiam), relates to a double jeopardy claim that a defendant raises on appeal after pleading guilty. In *Menna*, the New York Court of Appeals had held that such a claim was waived as a result of the guilty

---

[2] Though not relevant for purposes of this case, as we noted in *De Vaughn*, the Eleventh Circuit has interpreted the *Cotton* holding to cover only a subset of cases involving jurisdictional attacks on defective indictments. *See* 694 F.3d at 1147–49 (citing *United States v. Peter*, 310 F.3d 709 (11th Cir. 2002)). We reasoned in *De Vaughn* that the Eleventh Circuit's holding cannot be squared with *Cotton*. *Id*.

-11-

plea. The Supreme Court reversed, holding that while there were circumstances under which a double jeopardy claim could be waived with a guilty plea, such circumstances did not apply for a charge that "judged on its face . . . the state may not constitutionally prosecute." *Id.*

The Court clarified the *Menna* holding in *United States v. Broce*, 488 U.S. 563 (1989). In *Broce*, defendants who pleaded guilty to two separate counts of conspiracy relied in part on *Menna* in an attempt to vacate their sentences. *Id.* at 565-67. They argued that the schemes alleged in their indictments constituted only a single conspiracy and thus they had not waived their claim that double jeopardy applied. *Id.* Yet the Court in *Broce* denied the relief the defendants sought, reasoning that while *Menna* involved an indictment that was "facially duplicative of the earlier offense of which the defendant had been convicted," the defendants' claim related to "indictments that on their face . . . described separate conspiracies." *Id.* at 575–76.

The Supreme Court recognized a second exception to the waiver rule in *Blackledge v. Perry*, 417 U.S. 21 (1974), where a prosecutor indicted a defendant on a felony charge after the defendant had exercised his right to appeal a conviction to a misdemeanor charge arising from the same conduct. *Id.* at 22–23. Although the defendant pleaded guilty to the second charge, the Court held that "it was not constitutionally permissible for the State to respond to [the defendant's] invocation of his statutory right to appeal by bringing a more serious

-12-

charge against him . . . ." *Id.* at 28–29. Under such circumstances, the Court

reasoned, "[t]he very initiation of the proceedings against [the defendant] . . .

operated to deny him due process of law." *Id.* at 30–31. The Court held that in

this context, the guilty plea did not foreclose the defendant's attack on his

conviction through a federal writ of habeas corpus. *Id.* at 31.

In short, then, as we noted in *De Vaughn*, we are normally required to

accord a guilty plea preclusive effect. *Id.* at \*3. Yet *Blackledge* and *Menna*

create "[a] narrow exception . . . for two constitutional claims – due process

claims for vindictive prosecution and double jeopardy claims that are evident

from the face of the indictment." *Id.* (citing *Blackledge*, 417 U.S. at 30–31, and

*Menna*, 423 U.S. at 62 n. 2).[3]

Doe suggests that his circumstances are similar to those of the defendants

in *Blackledge* and *Menna* and that a non-jurisdictional exception to the waiver

rule should therefore apply here. Yet the unique factual circumstances and

---

[3] There might be some tension between our holding in *De Vaughn* and the Supreme Court's holding in *Broce*. In *Broce*, the Court seems to have suggested that a defendant challenging his guilty plea on double-jeopardy grounds could rely not only on the face of the indictment but rather on the "indictment[] *and the existing record.*" 488 U.S. at 576 (emphasis added); *see also Broce*, 488 U.S. at 582 (Blackmun, J., dissenting) ("nothing in *Blackledge* or *Menna* indicates that the general constitutional rule announced in those cases was dependent on the fortuity that the defendants' double jeopardy claims were apparent *from the records below without resort to an evidentiary hearing*") (emphasis added). Doe also suggests that *Broce* allows this court to consider both the indictment and the record. As discussed below, however, Doe is not raising a double jeopardy claim in this instance; thus, we do not need to determine the precise scope of the authorities that a defendant can rely upon in mounting such a challenge to the constitutionality of a guilty plea.

narrow holdings of these cases are easily distinguished from Doe's case.

First, Doe argues that *Blackledge* stands for the broad proposition "that due process claims that implicate the Defendant's right to be brought in [*sic*] court are not waived." Aplt. Br. at 2. Yet such a broad rule would allow any defendant to manufacture any sort of due process violation as a means of undermining the finality of a guilty plea. This reading of *Blackledge* also ignores the fact that the Court in that case based its holding on the violation of the defendant's right to appeal, a right not implicated here. *See* 417 U.S. at 25–27. Rather than creating a broad means of circumventing the finality of a guilty plea for any alleged violation of due process, the Court in *Blackledge* "held that the potential for prosecutorial vindictiveness against those who seek to exercise their right to appeal raised sufficiently serious due process concerns to require a rule forbidding the State to bring more serious charges against defendants in that position." *Broce*, 488 U.S. at 574.

Doe's reliance on *Menna* is similarly unpersuasive, as nothing in the record or indictment here suggest that Doe is being placed in jeopardy twice for the same offense. Doe attempts to extend the holding of *Menna* beyond the double jeopardy context, yet he cites no authority for such a proposition and we can find none. Thus, this case implicates neither of the non-jurisdictional exceptions to the general waiver rule recognized by the Supreme Court in *Blackledge* and *Menna*.

Because Doe does not raise any jurisdictional challenge and cannot rely upon *Blackledge* or *Menna*, we agree with the government that this case is similar to *United States v. Wright*, 43 F.3d 491 (10th Cir. 1994). In that case, the defendant pleaded guilty to drug charges even though he had entered into an informal immunity agreement with the government. *Id*. at 493. He later filed a petition for a Writ of Error Corum Nobis, claiming that his due process rights were violated by the government's breach of the agreement. *Id*. In rejecting the defendant's claim, we noted:

> In this case, appellant was fully cognizant of the alleged governmental misconduct when he entered his plea. Instead of pursuing these claims further, he decided to accept the prosecution's plea bargain. By doing so, appellant waived any claim that the government breached its non-prosecution agreement with him. While appellant's allegations, if true, demonstrate troublesome conduct by the prosecution, they do not call into question the knowing and voluntary nature of his plea. Appellant is therefore barred from raising such a claim in his section 2255 petition.

*Id*. at 494. *Wright* is on point and controls this case: just as in *Wright* we must give preclusive effect to Doe's guilty plea.[4]

Finally, even if Doe's claim was not precluded by his guilty plea, it would

---

[4] Doe tries to distinguish *Wright*, on the ground that, unlike *Wright*, there was no "bargained-for consideration," in exchange for his guilty plea. Aplt. Reply at 4. This distinction is inaccurate. In exchange for his guilty plea, the government agreed to dismiss two additional counts of the indictment and to allow Doe to plead guilty to only two counts. Further, Doe does not dispute that he made a counseled, strategic decision to plead guilty instead of proceeding to trial. This choice, which was Doe's to make, prevents him from rehabilitating his claim on appeal.

still fail. The district court found as a factual matter that no express or implied immunity agreement had been formed, nor could Doe reasonably rely on Schulz's representations about his criminal conduct. The district court thoroughly investigated the factual allegations, considered the implications for the case as a whole, and found that, while some of Schulz's behavior was troublesome, he at no point communicated an offer of immunity to Doe or reasonably induced Doe to believe one existed.[5] Thus, Doe cannot even sustain the factual predicate for a constitutional challenge, even if those cases more broadly applied to implied immunity arrangements.

Accordingly, Doe has no basis to challenge the waiver of appeal in his plea agreement.

### B. Outrageous Government Conduct

In the alternative, Doe argues that even if he waived his right to appeal, the government's conduct here was so egregious, we should exercise our discretion to ignore the appeal waiver and dismiss the indictment. Again, we disagree.

As an initial matter, a defendant can waive claims that even implicate a charge of government misconduct. For example, a defendant can plead guilty to charges where he believes the facts would support an entrapment defense or,

---

[5] For the same reasons, we would reject Doe's multiple contract claims—estoppel, unjust enrichment, ratification—because the district court found insufficient facts to support reasonable reliance since Schulz continuously cautioned Doe against engaging in criminal activity.

alternatively, choose to proceed to trial, despite a good argument for entrapment. Additionally, this is merely a defense with factually complex requirements, rather than a matter of jurisdiction or due process that cannot be waived. *See United States v. Mosley*, 965 F.2d 906, 909–10 (10th Cir. 1992). Thus, we conclude that Doe's guilty plea waives his right to independently challenge his claims of government misconduct.

But even if we reached the merits, his claim would still fail. We have recognized in certain circumstances that outrageous government conduct can be grounds for dismissal of criminal charges. The outrageous conduct defense is an outgrowth of the entrapment doctrine and shares some similarities. *United States v. Russell*, 411 U.S. 423, 428–30 (1973). While entrapment focuses on the defendant's readiness to commit crimes, the outrageous conduct defense focuses on the government's conduct. *Mosley*, 965 F.2d at 909.

Accordingly, "[t]he cases on outrageous conduct suggest two factors that form the underpinnings for most cases where the outrageous conduct defense has been upheld: government creation of the crime and substantial coercion." *Id.* at 911. While "no specific rule has been formulated to determine when the involvement of the government in a criminal enterprise becomes excessive," *id.*, "[t]he outrageous conduct defense . . . is an extraordinary defense that will only be applied in the most egregious circumstances. In order to prevail, the defendant must show that the challenged conduct violated notions of fundamental fairness

-17-

and is shocking to the universal sense of justice." *United States v. McKissick*, 204 F.3d 1282, 1294 (10th Cir. 2000) (internal quotation omitted).

As to governmental crime creation, we have held "it is not outrageous for the government to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity." *Mosley*, 965 F.2d at 911; *see also United States v. Biswell*, 700 F.2d 1310, 1313 (10th Cir. 1983) (permitting the act of an agent suggesting that the defendant illegally sell food stamps). In fact, the government can provide supplies and expertise, *see United States v. Belzer*, 743 F.2d 1213, 1218 (7th Cir. 1984), or act as both supplier and buyer in sales of illegal goods. *See Hampton v. United States*, 425 U.S. 484, 485 (1976).

In this case, Schulz persuaded Doe to serve as a CI because he was already involved with the organization—clearly not an inducement to *create* crime. It was at most an inducement to *extend* criminal activity, which is not prohibited. *See United States v. Sneed*, 34 F.3d 1570, 1577 (10th Cir. 1994) (finding that it is an extraordinary defense reserved for only the most egregious circumstances; it is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating); *see also United States v. Nichols*, 877 F.2d 825, 827 (10th Cir. 1989) (finding it is not outrageous for the government to infiltrate an ongoing criminal enterprise).

Likewise, to establish governmental coercion, a defendant must show

conduct that "must be particularly egregious before it will sustain an outrageous conduct defense." *Mosley*, 965 F.2d at 912. We have previously rejected defendant theories premised on governmental coercion when a financial inducement was offered to someone with little annual income, *United States v. Sandia*, 188 F.3d 1215, 1220 (10th Cir. 1999), when narcotics were offered at a "shockingly cheap" price, *Mosley*, 965 F.2d at 912–13, or when narcotics were distributed to a known addict, *United States v. Harris*, 997 F.2d 812, 816 (10th Cir. 1993), among others. The hallmark of governmental coercion is only when the government "engineers and directs the criminal enterprise from start to finish." *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994). In fact, the defense has only been successful a few times, and never in this circuit. *See Harris*, 997 F.2d at 816 n.3 (detailing two successful applications; in both cases the government agent engineered the crime and provided indispensable resources for the crime to be successful, *see United States v. Twigg*, 588 F.2d 373, 380–81 (3d Cir. 1978); *Greene v. United States*, 454 F.2d 783, 786–87 (9th Cir. 1971)).

The conduct Doe complains of here does not approach this level of government coercion. Doe points to *United States v. Gardner*, 658 F. Supp. 1573 (W.D. Pa. 1987), in which an informant repeatedly asked the defendant to assist him in obtaining cocaine. The defendant had no criminal record and had never been involved in the use or distribution of drugs. While he initially refused, the defendant eventually assisted the informant in obtaining quantities of drugs, but

did not profit from any of the transactions. The court found that the defendant "had no prior involvement with drugs," and the government was the defendant's "only client." *Gardner*, 658 F. Supp. at 1575–76. The court concluded that the informant "undeniably badgered, cajoled, induced, inveigled and utilized his position as a postal employee to acquire [the defendant's] friendship and utilized promises of assisting him in repairing his car to induce [the defendant's] cooperation in . . . obtaining drugs for [the informant's] personal use." *Id.* at 1576.

Nothing of the sort was going on here. Doe was already involved with a criminal organization and had been arrested on other charges many times. As we have previously held, "[i]t is not outrageous for the. government to infiltrate an ongoing criminal enterprise or to induce a defendant to repeat, continue or even expand previous criminal activity. . . . it is permissible for the government to suggest the illegal activity, provide supplies and expertise, and act as both a supplier and buyer of illegal goods." *Pedraza*, 27 F.3d at 1521. "This court has recognized the defense of outrageous government conduct, but has never rendered a decision upholding such a claim." *United States v. Worthon*, 520 F.3d 1173, 1181 (10th Cir. 2008). The facts of this case do not warrant a departure from our prior cases.

Accordingly, even if it were not waived, the outrageous government conduct exception does not apply.

## III.  Conclusion

Based on the foregoing analysis, we AFFIRM Doe's conviction, DISMISS his appeal, and GRANT his motion to seal the briefs.