UNITED STATES of America

v.

John WARD Appellant in 85–1632

and

Steven Keiper a/k/a "Butch" Appellant in 85–1637.

Nos. 85–1632, 85–1637.

United States Court of Appeals, Third Circuit.

Submitted Under the Third Circuit Rule 12(6) June 4, 1986

Decided June 20, 1986.

Rehearing and Rehearing In Banc in No. 85–1632 Denied July 14, 1986.

Michael J. Weintraub, Lambertville, N.J., for appellant Ward.

John J. Kerrigan, Jr., Stuckert & Yates, Newtown, Pa., for appellant Keiper.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., John P. Pucci, Asst. U.S. Atty., Ronald A. Sarachan, Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before ADAMS, WEIS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The primary question presented in these consolidated criminal appeals is whether the government's involvement in the commission of the offenses for which defendants were convicted was so outrageous as to violate their right to due process.

Defendants John Ward, Steven Keiper and John Bedekovic were charged with conspiracy to possess with intent to distribute 20,000 pounds of marijuana. 21 U.S.C. §§ 841(a)(1), 846 (1982). In addition, Ward was charged with two counts and Keiper with one count of interstate travel to facilitate unlawful activity, 18 U.S.C. § 1952 (1982), and Ward was charged with three counts of illegal use of a communications facility to execute the unlawful conspiracy, 21 U.S.C. § 843(b) (1982). Bedekovic pleaded guilty on the first day of trial and testified on behalf of the government. Ward and Keiper admitted all elements of the offenses charged, but asserted an entrapment defense. The jury rejected this defense and convicted Ward and Keiper on all charges.

On appeal, Ward and Keiper do not contest the jury's verdict regarding entrapment. Rather, they insist that the district court erred in refusing to dismiss the indictment on the ground that law enforcement conduct in this case violated due process as a matter of law. Defendants also assert objections to certain evidence introduced at trial. Since we do not find these contentions meritorious, we will affirm.

### I.

The evidence produced at trial demonstrated that the marijuana distribution scheme originated in December 1984, when Bedekovic was an inmate at the federal prison in Allenwood, Pennsylvania. A fellow prisoner, Jack Goepfert, was an FBI informant. According to Bedekovic, Goepfert approached him and proposed to finance a marijuana distribution endeavor, to be operated by friends of Bedekovic who were not incarcerated. Informant Goepfert testified that Bedekovic, not he, initiated the discussion of illegal activities.

Goepfert explained without contradiction that Bedekovic told him that Bedekovic's associates could handle the distribution of up to 3,000 pounds of marijuana per week. Goepfert imparted this information to an FBI special agent, and on January 24, 1985, the agent, posing as a drug dealer, met at Allenwood with Goepfert, Bedekovic, and Bedekovic's friend, defendant Ward. The special agent later turned the case over to Drug Enforcement Administration (DEA) personnel, who continued the negotiations.

After numerous telephone calls, Bedekovic induced another friend to join the con-

spiracy: defendant Keiper. Keiper's role would be to drive a truck containing the marijuana from Panama City, Florida to a "safehouse" in western Pennsylvania.

Over subsequent months, Ward paid the DEA agents $30,000 in requested seed money to finance the smuggling operation, made many trips to Allenwood to talk to Bedekovic, and, along with Keiper, travelled in Ward's plane to inspect the safehouse where the marijuana was to be stored. Defendants also inspected the location in Florida, used by the DEA, which included landing strips, docking facilities, and other accoutrements of an organized smuggling operation.

The final plan called for the DEA agents to sell 20,000 pounds of marijuana to the defendants, in return for $5.8 million to be paid over a two-week period. On March 24, 1985, Ward and Keiper met the putative drug suppliers in Florida to consummate the transaction. After Ward sampled and expressed his satisfaction with the contraband, he and Keiper were arrested.

Other evidence introduced at trial showed that the Allenwood arrangement was not the only participation in drug trafficking by the defendants. It was established, through Ward's own admissions taped during the course of the conspiracy as well as through other testimony, that he had engaged in major drug deals regularly for at least ten years. Keiper admitted at trial that he had arranged or participated in the transportation of large amounts of marijuana in 1979 and 1983.

## II.

■ Both defendants allege that the government's involvement in and creation of the drug smuggling operation was so "outrageous" that it violated fundamental fairness and due process.

The outrageous conduct doctrine finds support in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). The Supreme Court had held previously that the entrapment defense focuses on the predisposition of the defendant, and not the government's objectively improper conduct. *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In *Hampton,* however, five Justices intimated that certain government conduct may be so offensive to notions of due process that it violates the defendant's constitutional rights, regardless of the defendant's predisposition. Although a majority in *Hampton* affirmed the defendant's conviction, three Justices dissented and declared that the government's conduct violated due process, 425 U.S. at 497, 96 S.Ct. at 1653 (Brennan, J., dissenting), and two concurring Justices strongly indicated their agreement that such a defense exists, *id.* at 493, 96 S.Ct. at 1651 (Powell, J., concurring). Justice Powell added:

> I emphasize that the cases, if any, in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses, which are so difficult to detect in the absence of undercover Government involvement. One cannot easily exaggerate the problems confronted by law enforcement authorities in dealing effectively with an expanding narcotics traffic....

*Id.* 425 U.S. at 495–96 n. 7, 96 S.Ct. 1653 n. 7.

Accepting the existence of the due process defense, this Court in *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978), determined that there was a "demonstrable level of outrageousness" in the degree of official participation in the illegal manufacture of methamphetamine hydrochloride ("speed") and related offenses by the defendants in that case. Accordingly, the defendants' convictions for these crimes were vacated. In *Twigg,* Kubica, a government informant, contacted Neville, a long-time acquaintance, and they agreed to manufacture and distribute speed. Neville provided $1,500 and was to be primarily responsible for distributing the product; defendant Twigg had a minor role. Kubica, meanwhile, undertook to supply the necessary equipment,

raw materials, and laboratory location, and also directed the manufacturing operation. The Court, in a 2-to-1 decision, and without delineating a specific test, found on these facts a lack of fundamental fairness in defendants' convictions.

To date, *Twigg* remains the only post-*Hampton* appellate court decision to reverse a conviction because of law enforcement conduct characterized as "outrageous." But *see United States v. Lard,* 734 F.2d 1290, 1296 (8th Cir.1984) (reversing conviction on the basis of entrapment, but also noting that the government conduct "approached" outrageousness). "Despite the holding in *Twigg,* this court and other appellate courts have since exercised extreme caution in finding due process violations in undercover settings." *United States v. Gambino,* 788 F.2d 938, 945 n. 6 (3d Cir.1986). An example of such caution is our decision in *United States v. Beverly,* 723 F.2d 11 (3d Cir.1983) (per curiam).

In *Beverly,* a government informant introduced defendant Adams to a federal agent. Adams boasted—he later claimed falsely—that he was an experienced arsonist, and the agent offered Adams $3,000 to burn a building. A government-owned building was used as the target, and a Philadelphia police officer posed as the owner of the building seeking the arson. Adams then recruited Beverly, who said he had never been involved in any previous arsons. The agent purchased a gasoline can, gasoline and disguises, and drove the defendants to the building. At the building, defendants were arrested.

The facts in *Beverly* are quite similar to those in *Twigg* in a number of respects—both criminal activities relied at every stage on the initiation, participation and expertise of the government representative. Nevertheless, the *Beverly* Court declared: "We are not prepared to conclude that the police conduct in this case shocked the conscience of the Court or reached that 'demonstrable level of outrageousness' necessary to compel acquittal so as to protect the Constitution." *Id.* at 13. The Court was reluctant to exercise " 'a Chancellor's

foot' veto over law enforcement practices of which it [does] not approve." *Id.* (quoting *Russell,* 411 U.S. at 435, 93 S.Ct. at 1644).

Thus far the precise nature of the *Twigg* defense remains unclear. *United States v. Jannotti,* 673 F.2d 578, 606 (3d Cir.) (in banc), *cert denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). The present case, however, does not offer an appropriate opportunity to assay a clear definition, inasmuch as it presents facts hardly comparable to the egregious circumstances found in *Twigg* and to a lesser extent in *Beverly.*

Since here the government alleges that it aimed to infiltrate an existing distribution network, the prosecution contends that the case at hand is distinguishable from *Twigg.* The government cites the Supreme Court's decision in *Russell,* where the Court found no due process violation after the government supplied a necessary ingredient to a speed lab "already in process." 411 U.S. at 431–32, 93 S.Ct. at 1642–43. *See also United States v. So,* 755 F.2d 1350, 1353 (9th Cir.1985). Defendants deny that this case is dissimilar to *Twigg,* claiming that while they had participated in distribution activities in the past, they were not engaged in any such arrangements at the time they were approached.

Another distinction advanced by the prosecution rests on its assertion that Bedekovic—and not the government informant Goepfert—initiated the drug distribution plan. But defendants point to Bedekovic's testimony that the plan was Goepfert's idea, and the district court, in summarily denying defendants' motion to dismiss the indictment, made no findings of fact resolving these disputes.

Despite this uncertainty, it is undisputed that both Ward and Keiper made active efforts to promote the distribution scheme. Neither was, to use the district court's characterization, merely a "flunky" ordered about by government agents; each defendant took part to a significant extent in carrying out the plan. Ward advanced $30,000 in seed money, secured a safe-

house, and formulated plans with Bedekovic for the ultimate distribution of the marijuana. Keiper travelled to both Florida and western Pennsylvania, presumably to arrange the transportation of the contraband. Unlike the defendants in *Twigg* and *Beverly,* each brought significant experience and expertise to his role.

As the DEA's scheme entailed considerable participation on the part of defendants, it is not comparable to the completely government-initiated and government-operated plan found in *Twigg.* The prosecution's efforts to secure the arrest of two men experienced in drug distribution and arguably involved in ongoing distribution activities accordingly did not rise to the level of outrageous conduct violative of due process. Indeed, the attempt to apprehend defendants, after learning through an informant that they were ready, willing and able to participate in distribution activities, represents a classic example of undercover police work. A decision to reverse defendants' convictions would seriously undermine undercover law enforcement attempts to capture known suppliers of illegal drugs. *Hampton,* 425 U.S. at 495–96 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J., concurring).

### III.

Defendants also raise contentions concerning the evidence admitted at trial. The single disputed issue before the jury was defendants' entrapment defense. As noted earlier, there was substantial evidence of predisposition, based on evidence of prior acts, and neither defendant challenges the jury's implicit finding that defendants were predisposed to engage in a drug distribution scheme. They do, however, contest the admission of evidence on which the jury's finding was based.

■ Keiper argues that evidence of extrinsic acts is not admissible under Fed.R. Evid. 404(b) to prove predisposition. Other courts have held to the contrary. *See, e.g., United States v. Moschiano,* 695 F.2d 236, 243 (7th Cir.1982), *cert. denied,* 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983); *United States v. Burkley,* 591 F.2d 903,

921 (D.C.Cir.1978), *cert. denied,* 440 U.S. 996, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979). Rule 404(b) specifically excludes evidence of extrinsic acts only when such evidence is utilized to show that a defendant acted in conformity with those acts; it expressly permits such evidence to be used to show "plan" and "motive." Evidence of predisposition, for entrapment purposes, is used for reasons similar to the latter purposes, and is not simply intended to establish the defendant's bad character.

■ Ward insists that the district court abused its discretion in admitting references to prior acts of distribution committed a number of years before the acts set forth in the current indictment. He maintains that this evidence, designed to show predisposition, was too remote in time. We do not agree. Throughout the conspiracy, Ward boasted to the DEA agents concerning his "ten years" of experience in illegal smuggling. It is not possible to limit the broad reference of this relevant testimony, and evidence that Ward's illegal activities continued for a substantial period of time is significant in showing predisposition. There was no abuse of discretion in the ruling that the relevance of this evidence outweighs any prejudice.

■ The district court also permitted testimony concerning Ward's February 22, 1985 arrest by state officers in New Jersey for possession with intent to distribute eleven pounds of hashish valued at over $10,000. The state charges were still pending at the time of trial in the district court, and Ward contends that they therefore should have been inadmissible to prove predisposition. However, that issue was not preserved for appeal, since Ward's counsel did not object when the evidence was introduced. Further, admission of the evidence did not rise to the level of "plain error." *See* Fed.R.Evid. 103(d). The prosecution represents that it was prepared to call the police officer who made the arrest, who would testify that Ward admitted ownership of the hashish. Such evidence would withstand a directed verdict on the underly-

ing charge, and hence is a sufficient foundation to permit admission in this proceeding for the purpose of showing predisposition. *United States v. Jimenez*, 613 F.2d 1373, 1376 (5th Cir.1980).

 Next, Keiper urges that the district court's refusal to grant severance deprived him of a fair trial. He argues that given Ward's history of drug dealing, Ward's contention of predisposition was "ludicrous," and biased the jury against both defendants. We recently summarized the proper scope of appellate review of the rejection of a severance motion:

A motion for severance is addressed to the discretion of the district court, *United States v. Boyd*, 595 F.2d 120, 125 (3d Cir.1978), and a defendant has a "heavy burden" to show abuse of discretion; "he must demonstrate clear and substantial prejudice resulting in a manifestly unfair trial." *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir.1981). "[T]he primary consideration is whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants...." *United States v. DeLarosa*, 450 F.2d 1057, 1065 (3d Cir.1971), *cert. denied*, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972).

*United States v. Wright-Barker*, 784 F.2d 161, 175 (3d Cir.1986). The district court did not abuse its discretion in this respect either. Participants in a single conspiracy should ordinarily be tried together for purposes of judicial efficiency and consistency, even if the evidence against one is more damaging than that against another. *United States v. Jackson*, 649 F.2d 967 (3d Cir.), *cert. denied*, 454 U.S. 871, 102 S.Ct. 341, 70 L.Ed.2d 176 (1981). Further, the evidence of predisposition introduced against only two defendants was not complicated, and could readily be "compartmentalized" as to each of them.

 Finally, Keiper contends that the district court erred in admitting DEA Special Agent Hahner's testimony that during the conspiracy Ward told him, "Butch [Keiper] had worked for him and for other people, some guy named Eddie, had done

marijuana transports before." This evidence, admissible as a co-conspirator's statement under Fed.R.Evid. 801(d)(2)(E), was relevant to evince Keiper's predisposition. Keiper also argues that the admission of a co-conspirator's inculpatory statement violates his constitutional right of confrontation. He cites *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), in which the Supreme Court held that an accomplice's hearsay confession incriminating the defendant is presumptively inadmissible if the defendant has no opportunity to cross-examine the declarant. *See Lee v. Illinois*, —— U.S. ——, 106 S.Ct. 2056, 2063–64, 90 L.Ed.2d 514 (1986). However, the Supreme Court has explained that a statement that falls within a hearsay exception is treated differently for constitutional purposes. *See Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980).

In a case directly relevant to the matter at hand, the Supreme Court recently held that a co-conspirator's statement that falls within Rule 801(d)(2)(E) is admissible whether or not the declarant is presented for cross-examination. *United States v. Inadi*, —— U.S. ——, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986). The only prerequisite is that the statement bear indicia of reliability. *United States v. Ammar*, 714 F.2d 238, 255 (3d Cir.), *cert. denied sub nom. Stillman v. United States*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). Ward's out-of-court statement meets this test. As in *Ammar*, the comment in the present case "appear[s] to have been based on first-hand knowledge, [was] made under circumstances which suggest little incentive for prevarication, and [was] corroborated by additional evidence." *Id.* at 256–57 (footnote omitted).

IV.

Defendants' convictions will be affirmed.