UNITED STATES of America

v.

Juwhan YUN, a/k/a J.W. Yun and Charles Caplan.

Crim. No. 89–16.

United States District Court, D. New Jersey.

July 18, 1989.

OPINION

SAROKIN, District Judge.

INTRODUCTION

It cannot be refuted that undercover operations are a necessary and accepted means for discovering and prosecuting criminal activities. In addition, it must be recognized that those who participate in such activities on behalf of the government place themselves at great personal risk. However, there is a concomitant peril to those who are the subject of such undercover operations, if the zeal of the agents to discover criminal activity causes them to create it.

In this case, the defendant made an inquiry about a legal transaction for which he had a license from the federal government. In making the inquiry, he disclosed his name, address, and telephone number. Those circumstances alone launched the undercover investigation. There is no evidence that the defendant would have or could have pursued the purchase of the illegal item for which he was eventually charged, but for the intervention of the government agent. Indeed, the jury verdict reflects a conviction of the defendant primarily for what he said, rather than for what he did.

Although the actions of the agent clearly raised the issue of entrapment, the jury rejected that defense and the court will not interfere with the jury's finding in this regard. However, the court fears that the absence of any established minimum standard for the commencement of an undercover operation places innocent persons in jeopardy and dilutes every citizen's right of privacy.

Should a government agent acting in an undercover capacity be permitted to attempt to engage someone in criminal activity when the government possesses no information that such person ever was, is now, or intends to be engaged in *any* criminal activity? Should our government be permitted, through subterfuge and deceit, to seek out a law-abiding citizen for the sole purpose of testing whether or not such person will engage in illegal conduct?

Mark S. Olinsky, Asst. U.S. Atty., Newark, N.J., for U.S.

Stephen N. Dratch, Greenberg, Margolis, Ziegler, Schwartz, Dratch, Fishman, Franzblau & Falkin, P.A., Roseland, N.J., for defendant Yun.

Were it not for the actions of the agent, it is unlikely that the defendant would have committed the crime for which he was convicted. However, the jury found that the defendant was predisposed, and thus not entrapped. No authority now exists which would permit this court to find that the mere initiation of the investigation violated defendant's due process rights. Moreover, the conduct of the agent, although offensive and objectionable in many respects throughout the course of the investigation, was not so outrageous as to permit or require this court to set aside the jury's verdict of guilt. Therefore, the defendant's motions for a judgment of acquittal and, in the alternative, for a new trial, shall be denied for the reasons hereinafter set forth.

## BACKGROUND

On January 20, 1989 defendant Yun was indicted on two charges. Count One charged that Yun conspired to export from the United States the defense article Sarin, or nerve gas, without obtaining a license or other written approval from the government in violation of 22 U.S.C. Sections 2778(b)(2) and (c), 22 C.F.R. Section 127.1, and 18 U.S.C. Section 371. Count Two charged that Yun attempted to export Sarin without obtaining a license or other written approval.

After a three-week trial by jury, Yun was acquitted of the attempt charge but was convicted of the conspiracy charge. Yun now moves for an order entering a judgment of acquittal on the conspiracy count pursuant to Fed.R.Crim.P. 29 or, in the alternative, for a new trial pursuant to Fed.R.Crim.P. 33.

## DISCUSSION

*Legal Standard.*

On a post-verdict motion for acquittal, this court

> must view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating credibility of witnesses, finding the facts, and drawing justifiable inferences. A verdict will

be overruled only if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.

*United States v. Coleman,* 811 F.2d 804, 807 (3d Cir.1987) (citations omitted).

■ A motion for a new trial may be granted if necessary to prevent injustice or to correct a verdict that was against the weight of the evidence. *American Bearing Co., Inc. v. Litton Industries,* 729 F.2d 943, 946 (3d Cir.1984), *cert. denied,* 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984).

*Yun's Due Process Argument.*

■ Yun renews his contention that the government's undercover investigation was so outrageous that it constituted a violation of his due process rights and warrants the entry of a judgment of acquittal by this court.[1] Yun relies heavily upon the decision of the Third Circuit Court of Appeals in *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978).

In *Twigg,* a jury convicted defendants Neville and Twigg on charges stemming from the illegal manufacture of a controlled substance. The Drug Enforcement Administration (DEA) obtained the cooperation of a convicted felon named Kubica in connection with a plea agreement on a drug charge. Kubica contacted Neville and proposed setting up a methamphetamine laboratory. Neville subsequently invited Twigg to join in the operation. Kubica, the government agent, was completely in charge of the entire laboratory, and furnished all of the laboratory expertise. Neither defendant had the know-how with which to actually manufacture the drug. Assistance by Neville and Twigg was minor and at the specific direction of Kubica. The government supplied much of the necessary chemicals and equipment, as well as an isolated farmhouse well-suited for the location of an illegally operated laboratory,

---

1. Yun previously moved for dismissal of the indictment on due process grounds at the close of the government's case and at the close of all the evidence. The court denied both motions.

all at no cost to the defendants. *Id.* at 375–76, 380–81.

The court concluded as follows:

Using Kubica, and actively participating with him, the DEA agents deceptively implanted the criminal design in Neville's mind. They set him up, encouraged him, provided the essential supplies and technical expertise, and when he and Kubica encountered difficulties in consummating the crime, they assisted in finding solutions. This egregious conduct on the part of government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs. Fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred.

*Id.* at 381. The court also reversed the conviction of Twigg, who ran errands for the criminal enterprise, because he contributed nothing in terms of expertise, money, supplies, or ideas and would not even have shared in the proceeds of the sale of the drug. *Id.* at 382.

Yun points to one other decision of this jurisdiction in support of his due process defense.[2] In *United States v. Gardner,* 658 F.Supp. 1573 (W.D.Pa.1987), the district court granted a defendant's motion to dismiss an indictment on drug charges. The court found that an undercover government agent "undeniably badgered, cajoled, induced, inveigled and utilized his position as a postal employee to acquire Gardner's friendship and utilized promises of assisting him in repairing his car to induce Gardner's cooperation in obtaining [drugs]." *Id.* at 1576. The court also concluded, as a matter of law, that the defendant had no previous predisposition of any kind to violate the law. *Id.* at 1577. After a hearing on defendant's motion, at which the government elected not to present any evidence, the court concluded that the conduct of the law enforcement officials was so outrageous that due process of law principles would bar the government from securing a conviction. *Id.*

Yun argues that the facts adduced at trial demonstrate that the government agent violated his due process rights. Yun contends that the government lacked a sufficient basis to initiate any investigation; that he knew nothing about Sarin prior to the government's investigation; and that the government agent consistently misrepresented facts about his identity and intention to perform a legitimate deal which Yun had guaranteed with a performance bond. In Yun's view, the scheme to obtain a phony export license for Sarin by bribing officials originated with the government agent, rather than Yun. Yun catalogs a litany of inducements, ranging from the government agent's promises of future partnerships and profits to his dismissing as unfounded Yun's worries about the legal consequences of their dealings. In essence, Yun argues that the government's promise to deliver a legal commodity induced his reliance (his posting of a performance bond), and that the government sought first to link the legal and illegal deals, and then to insist that the illegal deals be consummated prior to the shipment of the legal commodity. He insists that he was an "obvious novice," and that is is inconceivable that he would have engaged in such illegal arms dealings without the knowledge and assistance of the government. Yun submits that the conduct of the government agents violated his due process rights, necessitating a judgment of acquittal.[3]

The government opposes Yun's motion for acquittal, arguing that the case law

---

**2.** Yun also points to a decision of a district court in the Ninth Circuit in *United States v. Batres–Santolino,* 521 F.Supp. 744 (N.D.Cal. 1981). In *Batres–Santolino,* the court dismissed an indictment on drug charges against "obvious novices," because it was "inconceivable that they could have entered the secretive world of international drug smuggling on their own." *Id.* at 751.

**3.** Yun also moves for an evidentiary hearing on the issue of the government's conduct. Because the court is satisfied that the relevant facts were brought out at trial, the motion is denied.

simply does not afford any ground for overturning the jury's verdict in this matter. The government points out that *Twigg* stands virtually alone as Third Circuit precedent for the due process defense. The government, in turn, relies upon the *en banc* decision of the Third Circuit in *United States v. Jannotti*, 673 F.2d 578 (3d Cir.1982), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), as well as the consistent line of decisions limiting the due process defense.

Prior to discussing *Jannotti* and its progeny, the court notes that an examination of the Supreme Court's pronouncements in this area reveals that the scope of *Twigg* is indeed limited. In *United States v. Russell*, 411 U.S. 423, 431–33, 93 S.Ct. 1637, 1642–44, 36 L.Ed.2d 366 (1973), the Supreme Court traced the history of the entrapment doctrine and concluded that the key inquiry was properly focused on the defendant's state of mind, and not the government's conduct. The Court did state, however, that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1643. Because the defendant in *Russell* was an "active participant in an illegal drug manufacturing enterprise," *id.* at 436, 93 S.Ct. at 1645, the Court held that the due process defense was not a bar to his conviction.

In *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the defendant attempted to set aside his conviction on drug charges, relying upon the due process defense recognized in *Russell*. Although conceding that the government "obviously played a more significant role in enabling petitioner to sell contraband in this case than it did in *Russell*," a plurality of the Court stated that the remedy of a criminal defendant with respect to the acts of governments agents, with whom the defendant acts in concert, "lies solely in the defense of entrapment." *Id.* at 489–90, 96 S.Ct. at 1650. Because a jury had rejected the defendant's entrapment defense, implicitly finding predisposition, the due process defense was unavailable. *Id.*

In *Jannotti*, the Third Circuit interpreted the *Hampton* plurality opinion as hinting that the due process defense might not be available at all. 673 F.2d at 607. At the same time, the appellate court noted that a majority of the *Hampton* Court, composed of the three dissenting Justices and the two concurring Justices, rejected the view that the entrapment defense was the only doctrine available to a defendant alleging governmental misconduct. However, the court noted that the due process defense was extremely narrow in cases in which entrapment is at issue, highlighting Justice Powell's observation that "the cases, if any, in which proof of predisposition is not dispositive will be rare," and that "[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." 425 U.S. at 495, n. 7, 96 S.Ct. at 1653, n. 7 (concurring opinion).

*Jannotti*, which arose out of the ABSCAM investigation, demonstrates that the due process defense is simply not available except in the most egregious instances of governmental misconduct. *Jannotti* was convicted by a jury of conspiring to obstruct interstate commerce. The district court entered an order setting aside the verdict in its entirety based, in part, on a finding that the government's overreaching amounted to a violation of due process of law. The Third Circuit reversed the district court's order, concluding that the district court had "usurped the function of the jury to decide contested issues of fact," *id.* at 581, and directed the reinstatement of the jury's verdict.

In so holding, the Third Circuit instructed that the entrapment defense is separate and distinct from the due process defense. *Id.* at 606. The appellate court stated that a successful due process defense must be predicated on "intolerable government conduct which goes beyond that necessary to sustain an entrapment defense." *Id.* at 607. The court continued:

We must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable; the ramifications are wider and more permanent than when only a statutory defense [of entrapment] is implicated.

*Id.*

Applied to the facts in *Jannotti,* the Third Circuit determined that the government's inducements (cash bribes) were not so "exceedingly generous" as to negate the evidence of predisposition as a matter of law. *Id.* at 608. Therefore, it was error for the district court to focus on the nature of the government's inducements in finding a due process violation, because the extent of such inducement "necessarily was considered by the factfinder in its rejection of the entrapment defense." *Id.* The court held that where a jury rejects the entrapment defense, a successful due process defense must be predicated on other grounds. *Id.*

The *Jannotti* court factually distinguished *Twigg* as follows:

> ... in *Twigg,* it was the DEA agents who "set up" the defendant, "encouraged him" and "provided the essential supplies and technical expertise".... In contrast, in this case, the F.B.I. provided neither material nor technical assistance to the defendants; it merely created the fiction that it sought to buy the commodity—influence—that the defendants proclaimed they already possessed.

*Id.* A plurality of the Third Circuit would have overruled *Twigg* on the basis of the Supreme Court's decision in *Hampton. Id.* at 610, n. 17. Although *Twigg* remains viable, it is certainly not "the leading case in this jurisdiction ... on the issue of outrageous conduct by the government," as characterized by Yun. (Yun Brief, at 10).

In *United States v. Beverly,* 723 F.2d 11 (3d Cir.1983) (per curiam), the Third Circuit rejected the due process defense in a case in which government agents promised $3,000 to two financially distressed persons to burn a building, provided gasoline and disguises, and drove the pair in a government car to a building owned by the government, where they were arrested. *Id.* at 12. The court expressed "grave doubts about the propriety of such tactics," *id.* at 13, but concluded that the police conduct was not sufficiently outrageous to compel acquittal.

Notably, the *Beverly* court observed that the case relied upon by the *Twigg* majority, *United States v. West,* 511 F.2d 1083 (3d Cir.1975), was limited by *Hampton* and *Jannotti.* The court also cited *Russell* for the proposition that "the Supreme Court has admonished us that the federal judiciary should not exercise 'a Chancellor's foot' veto over law enforcement practices of which it [does] not approve." *Id.* at 12–13 (citation omitted).

In *United States v. Gambino,* 788 F.2d 938 (3d Cir.1986), *cert. denied,* 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986), defendants appealed their convictions for, *inter alia,* conspiring to distribute heroin. At trial, defendants presented evidence that the government agent had introduced the topic of heroin sales during discussions about dealing cocaine; that defendants expressed hesitancy to arrange a heroin sale; and that defendants demonstrated a lack of knowledge about the heroin business. The jury rejected the defense of entrapment. *Id.* at 943. On appeal, one defendant argued that even if the evidence supported a finding of predisposition, due process principles as recognized by *Twigg* provided ground for acquittal. The Third Circuit stated that "[d]espite the holding in *Twigg,* this court and other appellate courts have since exercised extreme caution in finding due process violations in undercover settings." *Id.* at 945, n. 6. The appellate court rejected the due process defense, finding no egregious government misconduct.

In *United States v. Ward,* 793 F.2d 551 (3d Cir.1986), defendants appealed their convictions for conspiracy to possess with intent to distribute a large quantity of marijuana. Defendants argued that the government's misconduct violated their due process rights. The Third Circuit examined the history of the "outrageous conduct doctrine," and concluded that *Twigg* was

the only post-*Hampton* appellate court decision to reverse a conviction because of law enforcement conduct characterized as "outrageous." *Id.* at 553–554. The *Ward* court pointed to the *Beverly* decision as an example of the "extreme caution" exercised by the court in finding due process violations in undercover settings. *Id.* at 554.

The *Ward* court found no due process violation, noting that both defendants brought significant experience and expertise to their roles and made active efforts to promote the distribution scheme. The court distinguished *Twigg* as follows: "As the DEA's scheme entailed considerable participation on the part of defendants, it is not comparable to the completely government-initiated and government-operated plan found in *Twigg*." *Id.* at 555.

In *United States v. Engler,* 806 F.2d 425, 429 (3d Cir.1986), *cert. denied,* 481 U.S. 1019, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987), the Third Circuit, relying upon the *Hampton* and *Jannotti* decisions, stated that allegations of government misconduct which are merely duplicative of a defendant's entrapment defense contentions "may not provide an independent basis for a defense or acquittal."

In *United States v. Martino,* 825 F.2d 754 (3d Cir.1987), as part of an undercover investigation, a grand jury subpoena was issued to an undercover agent in a pseudonym under which the agent was working. The district court found that the sham subpoena abused the grand jury process and dismissed an indictment arising from the investigation. Although the district court had explicitly invoked its supervisory power to protect the integrity of the judicial process, the Third Circuit treated the appeal as involving a question of due process. The Third Circuit reversed the district court's order and reinstated the indictment. In support of its conclusion that the government conduct did not constitute a violation of the defendant's due process rights, the court cited a Seventh Circuit decision stating that

[i]n the pursuit of crime the Government is not confined to behavior suitable for the drawing room. It may use decoys and provide the essential tools of the offense. The creation of opportunities for crime is nasty but necessary business.

*Id.* at 763, citing *United States v. Murphy,* 768 F.2d 1518, 1529 (7th Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986).

Most recently, in *United States v. Driscoll,* 852 F.2d 84 (3d Cir.1988), the Third Circuit rejected the appeal on due process grounds of a defendant convicted of receiving child pornography through the mail. The defendant argued that absent the government committing the federal crime of sending such material through the mail, he could not possibly be guilty of the crime. The appellate court rejected this contention, finding that the government's conduct approximated that which survived constitutional attack in *Jannotti.*

The court's review of the case law reveals that Yun's contentions do not support a viable due process claim. The court first reluctantly concludes that the initiation of the investigation of Yun did not violate his due process rights. The government's investigation in this case was prompted by a telephone call by an officer of a company which received Yun's inquiry about 105/106 mm. ammunition. The officer had previously been employed at the Customs Service for ten years. The court is troubled by reason of the fact that one of the bases for the government informant's suspicions about Yun's initial inquiry was that he spoke with an "Oriental" voice. (T1.74). However, the informant also stated that it was unusual for his company to receive a domestic inquiry seeking 105/106 mm. ammunition on behalf of the government of the Republic of Korea. (T1.79). The informant further explained that "[t]his is a very sensitive area of commercial industry, that our company is concerned about who our customers are." (T1.79) Based on this testimony, the court cannot find that the investigation was launched for an improper reason.

Moreover, the case law makes clear that no showing is required before the

government may commence an undercover investigation. For example, the *Jannotti* decision explicitly forecloses Yun's argument based upon the apparent lack of basis for the government's initial inquiry, stating that at least in the context of entrapment, "it is *inconsequential* whether law enforcement officials did or did not act on *well-grounded suspicion* that the defendant was engaging in wrongdoing, or whether they had *probable cause* for approaching the defendant." *Id.* at 609 (emphasis in original, citation omitted). *See also United States v. Driscoll, supra* (contention that government agents lacked reasonable basis to target defendant is of no legal significance); *Harrison v. Baylor*, 548 F.Supp. 1037, 1040 (D.Del.1982) (Stapleton, J.) (government agents may properly propose a criminal transaction to an individual without having a reasonable basis to suspect that he or she is engaging in wrongdoing).

■ In addition, the court concludes that the government's conduct after the investigation began did not violate Yun's due process rights. Yun claims that the scheme to obtain a phony export license through bribery originated with the government agent. *Gambino* rejected a similar claim that the government initiated the scheme for which the defendant was charged and convicted when, as in this case, prior discussions had referred to potential violations of the law. Yun's claim that he knew nothing of Sarin and expressed hesitation throughout is also unpersuasive, inasmuch as similar protestations were dismissed in *Gambino*. Yun argues that but for the government's involvement, he never would have committed the crime for which he was convicted. The defendant in *Driscoll* made the same argument, to no avail.

The due process defense, articulated in *Twigg*, now appears to be limited to a plan that is *completely* initiated and operated by the government. If the government was insufficiently involved in the arson plan in *Beverly* to warrant acquittal on due process grounds, then the government's involvement in this case cannot constitute a

constitutional violation. Moreover, the jury could have found that Yun played an active role in the scheme. Such a finding would be supported by evidence offered by the government, including the fact that Yun even brought documents relating to Sarin on a trip to England where he met with others interested in such a deal. Yun also calculated that his profits from the Sarin transaction would be substantial. Under the court's analysis in *Ward*, this level of involvement is sufficient to foreclose a due process defense.

In sum, the government offered sufficient evidence such that a jury could have found that Yun was an active participant in a plan to export Sarin without a legitimate license. In reviewing the evidence, this court cannot conclude that the plan was completely initiated and operated by the government. Accordingly, Yun's motion for an order entering a judgment of acquittal is denied.

*Entrapment as a Matter of Law*

■ Yun argues that the court should reverse the conviction, contending that the evidence demonstrates that he was entrapped as a matter of law on January 12, 1989. The basis for this contention is Yun's claim that "the evidence clearly demonstrates that on January 11, 1989, Mr. Yun withdrew from the conspiracy." (Yun Brief, at 40). Based on the proposition that the January 11 meeting proves his withdrawal, Yun contends that no evidence was introduced as to his predisposition between the meeting and the day of his arrest.

The Third Circuit has stated that entrapment is established as a matter of law "[w]here the evidence is *undisputed* that the defendant had no predisposition to commit the crimes with which he is charged, and was induced to do so only by the trickery, persuasion or fraud of the government." *Gambino, supra*, at 944 (emphasis added). In this case, the evidence did not clearly demonstrate that Yun withdrew from the conspiracy on January 11, 1989. Rather, what transpired during the January 11 meeting and "blow-up," as well as Yun's prior and subsequent actions, was hotly disputed by the parties and was for

the jury to evaluate. Specifically, it was for the jury to decide whether Yun withdrew from the conspiracy and it was for the jury to decide whether Yun had produced sufficient evidence of non-predisposition. *See Jannotti,* 673 F.2d at 606 ("[t]he ultimate factual decisions in an entrapment case must be left to the jury"). Viewing the evidence in a light most favorable to the government, the court finds no basis to disturb the jury's determination that Yun was not entrapped and did not withdraw from the conspiracy.

*Admission of F.R.E. 404(b) evidence.*

■ Over Yun's objections, the court ruled that tapes of conversations between Yun and the government agent concerning other arms transactions were relevant, and that their probative value outweighed any unfair prejudice to the defendant. Yun contends that the court erred in admitting the 404(b) evidence because it was only minimally connected with the crime charged and was designed to inflame and prejudice the jury. Yun argues that the admission of prior conversations about arms deals makes it likely that the jury convicted him not for the offense charged but for the extrinsic offenses, exactly what F.R.E. 403 was designed to avoid.

The government contends that the prior deals were relevant because they established a pattern by which the Sarin deal was to be carried out. Specifically, in the earlier conversations, Yun and the agent developed a code which substituted innocuous words for illegal items and discussed ways to circumvent export certification laws. Without the evidence of the prior discussions, the government contends, the jury could not have understood the later references to obtaining a license for Sarin at a price of $50,000 or that Yun's use of the word "saccharine" in place of "Sarin" followed a pattern of such code language. Moreover, the government argues that the earlier conversations were extremely relevant to the issue of predisposition, once entrapment became an issue.

Having reviewed the parties' arguments, the court again concludes that the prior conversations of arms transactions were relevant under F.R.E. 404(b) and that the probative value of such evidence was not substantially outweighed by the danger of unfair prejudice under F.R.E. 403. Moreover, the conversations were relevant and admissible with respect to the issue of Yun's predisposition.

*Admission of prior shipments of Vulcan spare parts*

■ During the government's rebuttal case, it offered evidence that from 1986 until 1988, Yun exported Vulcan automatic weapon spare parts valued at approximately $254,000 without an export license in violation of the Arms Export Control Act. The court admitted the evidence as relevant to Yun's predisposition.

Yun argues that invoices and other documents demonstrate that these shipments were not made surreptitiously. To the contrary, Yun submits that any violations of the Export Act were unintentional. Yun argues that the extrinsic act was a strict liability offense, requiring no element of criminal intent, which may not be admitted to prove that Yun had the specific intent to export Sarin without an export license. Moreover, Yun argues that the extrinsic evidence was of dubious relevance because the evidence showed that the spare parts could be used for other purposes.

The government agrees with the legal proposition that the charged offense and the extrinsic act require the same level of criminal intent in order for the extrinsic act to be admissible as proof of the defendant's intent to commit the charged offense. However, the government states that, as a matter of law, the knowing and willful export of the Vulcan spare parts without a license violated 22 U.S.C. Section 2778, involving the same statute and criminal intent for which Yun was convicted in this case. Because the extrinsic act and the charged offense involve the same level of criminal intent, the government argues, the evidence of prior shipments of Vulcan spare parts was admissible.

Yun concedes that the Vulcan shipments violated the Arms Export Control Act yet insists that "it is evident that the 'Vulcan' shipments were at best innocent infrac-

tions." (Yun Brief, at 55). However, whether the shipment of such items without a export license was knowing and willful was a matter for the jury to decide, and it was for the jury to consider Yun's explanation. Similarly, it was for the jury to weigh evidence that such spare parts could have been used for other purposes. Simply put, it was for the jury to decide whether such shipments were "innocent infractions" or whether they were evidence of Yun's predisposition to commit the crime for which he was convicted. Accordingly, the court finds no error in the admission of evidence of Yun's shipments of Vulcan spare parts without an export license.

*Government's Reference to Separate Grand Jury Investigation*

■ Yun argues that the court committed reversible error by permitting the government to elicit testimony that the government had obtained, as part of a *separate* grand jury investigation, a copy of the performance bond that Yun had posted on the legitimate 105/106 mm. deal. Yun contends that this error was compounded by the government's reference to the second investigation in summation.

At trial, Agent Kennan testified that the only bond Yun had shown him was "bogus." According to Yun, this testimony was designed to create the impression that Yun had not posted a valid performance bond with respect to the legitimate 105/106 transaction. To counter this notion, the defense called Special Agent Ventura to establish that the Customs Service had the performance bond in its possession *before* Agent Kennan testified. The defense proceeded in this manner even though the government offered to stipulate to the admission of the actual performance bond without testimony.

Prior to Ventura's testimony, the government informed the defense that the performance bond had been obtained as part of a grand jury investigation *after* Yun had been arrested, and represented that Agent Kennan had not seen a copy of the performance bond prior to taking the stand. (T6.4–6.7). On direct examination conducted by the defense, Agent Ventura testified

that he received the valid performance bond as a result of a grand jury subpoena. When asked to repeat how the bond had been obtained, Ventura testified that "Two Grand Jury subpoenas had been issued prior to the trial subpoena." (T6.14). Ventura also testified that he had discussed the contents of the documents obtained with the government's trial attorney and "probably" Agent Kennan. (T6.16).

Yun contends that the government improperly elicited on cross-examination that Yun had been the target of a second grand jury investigation. Agent Ventura testified on cross-examination as follows:

Q. Agent Ventura, the document that was just shown to you, 206 [the valid performance bond], that was obtained in connection with what investigation? Was it involved in this case?

A. Yes.

Q. Was it specifically part of this case that is on trial here?

\*     \*     \*     \*     \*     \*

[The court sustains Mr. Dratch's objection on the grounds that the question has been asked and answered].

Q. Agent Ventura, was your investigation—isn't it correct, your investigation over the past several months included matters beyond what is exactly on trial here today relating to the Sarin matter?

MR. DRATCH: Objection.

THE COURT: Overruled.

A. Correct.

Q. Isn't it true that the Grand Jury subpoena from which you obtained the document Mr. Dratch showed you was part of a different investigation?

A. Correct.

MR. DRATCH: Objection.

THE COURT: Overruled.

Q. So the documents that he showed you were not obtained for purposes of this case that is on trial here today?

A. Correct.

Q. And you did not obtain them until some months after the arrest of Mr. Yun on January 12, is that correct?

A. Yes, sir.

Q. So the Customs Service did not have a copy of the performance bond that Mr. Dratch just introduced into evidence until months after January 12th. Is that correct?

A. Correct.

Q. And do you have an estimate of approximately how many months it was before the Customs Service got a copy of the performance bond that is now in evidence?

A. Roughly I would say two to three months.

\*       \*       \*       \*       \*       \*

(T. 6.18–19).

Yun also argues that the government improperly referred to Ventura's testimony about the second grand jury investigation during his summation. Yun points to the following portion of the government's summation:

Agent Ventura testified that as part of a different investigation, he obtained bank records, reems of them, he said a foot high of documents, that he was not specifically looking for the performance bond and got those like a month or so ago ...

\*       \*       \*       \*       \*       \*

We are not saying it was a bogus bond, the point is what did Kennan know. The only thing he had seen as of January 11th, was a piece of paper that looked like a cut and paste job. You know what it looks like. You saw it. Nobody had given him a performance bond, Yun admitted that.

Nobody can confirm to him orally there was a performance bond posted. How can somebody argue that he was putting a pressure on a performance bond, he didn't know existed?

(T. 10.180–181).

In response, the government argues that the cross-examination of Agent Ventura was necessary to show the jury that the valid performance had been obtained in a separate investigation and had not been suppressed. The government also contends that its reference to the second investigation was necessary to rebut the defense contention that Agent Kennan had tried to mislead the jury by testifying that the only bond he had seen was a bogus one. Moreover, the government argues that any references to the second investigation were invited by the defense, which called Ventura to the stand and elicited testimony about how the government obtained the valid bond, after the government had represented that the bond had been obtained after Yun's arrest pursuant to a second grand jury investigation. Finally, the government points out that the defense refused the court's offer of a charge "that any reference to any other grand jury investigations should be disregarded." (T11.35).

The court permitted the defense to elicit from Agent Ventura testimony as to whether Agent Kennan knew that Yun had posted a valid performance bond, because such testimony would be relevant to Kennan's credibility. (T. 6.7–6.8) After Ventura testified that the government had obtained a copy of the valid bond, it was proper for the government to attempt to demonstrate that Kennan himself had not seen the bond, a point that Yun concedes. (Yun Brief, at 63). The crux of Yun's argument appears to be that the government could have elicited such testimony without bringing out the fact that Yun's records had been obtained pursuant to a *second* investigation.

However, the defense itself elicited mention of this second investigation in its direct examination of Agent Ventura, even asking the witness to repeat his reference to a second grand jury investigation. At that point, it was proper for the government to clarify on cross-examination the circumstances under which the bond was obtained. Similarly, it was not improper for the government to refer to the second investigation during its rebuttal summation, since the defense in its summation had attacked Kennan's credibility on this very point. Finally, the defense declined the court's invitation to charge the jury to disregard any reference to other grand jury investigations. Therefore, Yun is not entitled to a new trial on this ground.

*Jury Charge on Withdrawal*

■ The jury instructions on whether Yun withdrew from the conspiracy included the following provision:

> The United States can satisfy this burden [of proving beyond a reasonable doubt that the defendant was a member of the conspiracy and did not withdraw from it] either by impeaching the defendant's proof of withdrawal or by providing evidence of some conduct in furtherance of the conspiracy as charged in the indictment, not something else, subsequent to the alleged act of withdrawal.

(T. 11.63)

The defense asked the court to add the following sentence: "an act committed by the defendant subsequent to this withdrawal, which is unrelated to the furtherance of the conspiracy, does not satisfy the Government's burden." (T. 11.31)

Yun argues that this language would have been "more specific and instructive" (Yun Brief, at 65) and that its exclusion warrants a new trial. Yun contends that the jury should have been instructed not to consider his conversations with the agent after the January 11 blow-up in deciding whether he withdrew from the Sarin transaction. Yun implicitly assumes that it is beyond dispute that those conversations did not deal with the Sarin transaction.

The court is satisfied that the withdrawal charge is a correct statement of the law. *See United States v. Steele,* 685 F.2d 793, 804 (3d Cir.1982), *cert. denied,* 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982) ("When a defendant has produced sufficient evidence to make a prima facie case of withdrawal ... [the government] must rebut the prima facie showing either by impeaching the defendant's proof or by going forward with evidence of some conduct in furtherance of the conspiracy subsequent to the act of withdrawal.") Moreover, the court added the words "not something else," which appropriately addressed the concerns raised by defense counsel. Therefore, Yun is not entitled to a new trial on this ground.

*Government's Argument Based on Yun's Destruction of Documents*

■ It was not disputed at trial that Yun ripped up documents relating to the Sarin transaction and that those documents were recovered by the government after his arrest. Yun argued that his actions demonstrated his intention to withdraw from the agreement. In summation, the government disputed Yun's explanation, arguing that his actions reflected his intention to hide incriminating evidence. Yun objected to the government's argument on the grounds that the evidence did not support an inference that he was attempting to destroy evidence. Yun now renews this argument, and cites several cases which require a showing of bad faith before permitting an adverse inference from the destruction of records. Yun contends that the government's argument was baseless and prejudicial, necessitating a new trial.

The government first argues that the "adverse inference" cases cited by Yun involved the destruction of evidence, whereas in this case the documents were recovered and reconstructed. Thus, there was no issue in this case as to the content of such documents. The government contends that its argument was a reasonable interpretation of Yun's actions.

The court agrees with the position taken by the government. The court finds no basis to disturb its earlier ruling that the significance of Yun's destruction of documents relating to the Sarin deal was a fact question for the jury to resolve. (T11.-34) Because the court concludes that the government's summation on this point was not unfairly prejudicial, Yun's motion for a new trial is denied on this point.

*Request for Court Review of Grand Jury Transcripts.*

■ Yun argues that the government acted improperly in failing to provide the testimony of Agent Kennan to the grand jury, and that the court should determine whether the grand jury was apprised of the January 11 blow-up. Yun suggests that an inquiry by the court would reveal an intentional effort to conceal exculpatory evi-

dence from the grand jury in violation of his due process rights.

The government cites a myriad of cases holding that the prosecutor has no duty to present exculpatory evidence to a grand jury. Even if such a duty existed, the government contends that exclusion of the January 11 meeting would not have rendered return of the indictment "fundamentally unfair" because it was not clearly exculpatory evidence that would likely have convinced the grand jury not to indict. The government finds support for this conclusion in the verdict of the jury, which had before it Kennan's testimony and the circumstances of the January 11 meeting. Finally, the government argues that Yun has not made a sufficient showing to justify disclosure of grand jury materials.

Although the Third Circuit has not ruled on this issue, the majority view expressed by the courts is that a prosecutor has no duty to present any exculpatory evidence to a grand jury. *See United States v. Ismaili,* 828 F.2d 153, 165 n. 13 (3d Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988) (and cases cited therein). At the same time, the Third Circuit has recognized a line of authority that imposes upon a prosecutor a duty to present "exculpatory evidence of which he is aware." *Id.* This court need not decide whether to apply the majority rule, since the jury in this matter was presented with Kennan's testimony as well as the January 11 meeting. The jury's verdict demonstrates that such evidence was not exculpatory.

In light of the jury's verdict, disclosure of the grand jury proceedings would be futile. Yun's motion to dismiss the indictment is therefore denied.

CONCLUSION

For the foregoing reasons, defendant Yun's motions for an order entering a judgment of acquittal and for a new trial are denied.